IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER DIAWARA** *et al.*, *Plaintiffs* | : : : | CIVIL ACTION |
| v. | : : | |
| **UNITED STATES** *et al.*, *Defendant* | : : : | No. 18-3520 |

## MEMORANDUM

PRATTER, J.                                                                                   MARCH 9, 2020

Jennifer Diawara, Alpha Diawara, and their two children, J.D. and R.D., seek relief under the Federal Tort Claims Act ("FTCA") for injuries resulting from a car accident between the Diawaras and Amanda Galbreath, a driver for the United States Postal Service ("USPS"). The parties have filed three motions:

1. Plaintiffs' motion for leave to amend the ad damnum clause of Mrs. Diawara's Standard Form 95;

2. Plaintiffs' motion for partial summary judgment; and

3. The United States' motion *in limine* to exclude, in part, the testimony and report of the Diawaras' expert, Dr. Bruce Grossinger.

For the reasons that follow, the Court grants the motion for leave to amend, grants in part and deems moot in part Plaintiffs' motion for partial summary judgment, and grants the United States' motion *in limine*.

### BACKGROUND

During a family vacation in August 2015, Jennifer Diawara, Alpha Diawara, and their two children were driving through Columbia, Missouri. While the Diawaras were stopped at a red light, USPS employee Amanda Galbreath rear-ended their minivan. The United States does not

1

dispute that Ms. Galbreath caused the accident, thus breaching her duty to operate her vehicle prudently.

The day of the accident, Mrs. Diawara was transported to the hospital, reporting with back and shoulder pain. She was given two medications and a splint for her arm. The Diawaras then continued on their vacation, during the course of which Mrs. Diawara stopped to visit an urgent care center in Florida for shoulder pain. The Diawara family concluded their vacation by driving home to Philadelphia.

Once home, Mrs. Diawara suffered continued pain and restricted range of motion. On March 1, 2016, Mrs. Diawara had rotator cuff surgery and went on short-term disability until May 2016. Upon returning to work, she split her time between coming into the office and working from home.

Mrs. Diawara continued to suffer from pain and was treated by a variety of specialists, including orthopedic surgeons, neurologists, primary care physicians, and pain management physicians. Mrs. Diawara initially continued to work during this period of treatment. However, by December 2017, the pain caused her to apply for short-term disability. She remained on short-term disability until March 2018 when she applied for and was awarded long-term disability following a C5-6 and C6-7 anterior cervical discectomy and fusion. Mrs. Diawara's employment ended in April 2018 when her employer could no longer make accommodations for her to work from home. On May 22, 2019, the Social Security Administration declared Mrs. Diawara occupationally disabled. Mrs. Diawara's current prognosis is that she will never be able to return to work.

In the midst of treatments, Mrs. Diawara and her family filed Standard Form 95 claim forms with the Postal Service before instituting this lawsuit, as required under the FTCA. They

filed three forms on July 27, 2017: one for Mrs. Diawara and one for each child.[1] The ad damnum clause of Mrs. Diawara's Standard Form 95 claimed $850,000 in personal injury damages. On August 31, 2018, the USPS issued its final denial letter.

The parties have filed the three motions described above, and the Court addresses each in turn.

### MOTION FOR LEAVE TO AMEND THE STANDARD FORM 95 AD DAMNUM CLAUSE

On July 27, 2017, Mrs. Diawara filed her Standard Form 95 with the USPS, the ad damnum clause of which claimed $850,000 in damages. Plaintiffs now seek leave to amend the ad damnum clause from $850,000 to claim damages of $2,850,000.

#### I. Legal Standard

Amendments to a Standard Form 95 are governed by a stricter standard than Federal Rule of Civil Procedure 15(a). Section 2675(b) of the FTCA requires that an "[a]ction under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). "The plaintiff bears the 'burden of showing any newly discovered evidence or intervening facts bearing on the plaintiff's injuries.'" *Troilo v. Michner*, No. 13-2012, 2015 WL 12839014, at *2 (D.N.J. Nov. 17, 2015) (quoting *Schwartz v. United States*, 446 F.2d 1380, 1381 (3d Cir. 1971)).

"[P]recedent reveals basically two divergent lines of authority with respect to modification of a claim for damages under the FTCA." *Njos v. Kane*, No. 12-1252, 2015 WL 999398, at *3 (M.D. Pa. Mar. 5, 2015). The Fourth, Sixth, Eleventh, and D.C. Circuit Courts of Appeals permit increasing

---

[1] The Court granted an earlier motion to dismiss Mr. Diawara's claim for loss of consortium due to his failure to properly present it to the Postal Service.

3

a claim "when the claimant either did not know or reasonably could not have known the severity of the injury at the time the FTCA tort claim notice was filed." *Id.* The First and Fifth Circuit Courts of Appeals have adopted a "worst-case prognosis test," under which "there is first a subjective test as to whether the specific injuries were known at the time the administrative complaint was made" and "there is an objective test as to whether the plaintiff could have made out its worst-case scenario based on the basic severity of the injuries that were known." *Troilo*, 2015 WL 12839014, at *3.

The Third Circuit Court of Appeals has not yet adopted either approach. However, in determining whether a claimant has satisfied her burden, trial courts in the Third Circuit often apply the "reasonably discoverable" test of the Fourth, Sixth, Eleventh, and D.C. Circuit Courts of Appeals. *See, e.g., Troilo*, 2015 WL 12839014 at *5; *Njos*, 2015 WL 999398, at *3; *Bravo-Garcia v. United States*, No. 13-2185, 2015 WL 224625, at *6 (D.N.J. Jan. 15, 2015); *contra Chamberlain v. United States*, No. 11-1808, 2012 WL 136896, at *3 (D.N.J. Jan. 18, 2012) (applying the worst-case prognosis test).

## II.  Discussion

Plaintiffs claim that the extent of Mrs. Diawara's injuries was not reasonably foreseeable at the time she filed her Standard Form 95. They support this assertion with what they consider to be newly discovered evidence and intervening facts, including:

- Mrs. Diawara did not discover that she sustained injuries causing her permanent inability to do her job until she was declared occupationally disabled by the Social Security Administration on May 22, 2019;

- Mrs. Diawara did not undergo cervical surgery until March 15, 2018, the results of which caused her to suffer intrascapular discomfort and stiffness, left a permanent scar on her body, and left her at increased risk of developing cervical disc problems in the future; and

- Medical testimony confirms that Mrs. Diawara did not know and could not have known the nature and extent of her injuries until at least December 15, 2017.

4

The United States opposes, arguing that Mrs. Diawara could have and should have amended her Standard Form 95 claim to increase her damages at any point up until the USPS issued its denial letter on August 31, 2018. The United States also claims that Mrs. Diawara failed to identify newly discovered evidence or intervening facts given that her medical records establish, according to the defense, that her medical conditions are the product of a preexisting diagnosis, not the car accident at issue in this case, and there is no support for Mrs. Diawara's argument that she could not have anticipated that her injuries would cause her to be permanently out of work when she filed her claim.

In response, Plaintiffs do not dispute that Mrs. Diawara suffered from medical conditions prior to the vehicle accident in question. They do, however, argue that the accident exacerbated those conditions. They assert that this exacerbation would not have occurred but for the 2015 accident and, furthermore, was not known or reasonably discoverable when Mrs. Diawara filed her claim. They also argue that the plain language of Section 2675(b) requires only that an increased damages amount be "based upon newly discovered evidence not reasonably discoverable *at the time of presenting the claim to the federal agency*" and contains no requirement that a claimant must avail herself of her right to amend her Standard Form 95 prior to the agency's decision. 28 U.S.C. § 2675(b) (emphasis added).

### A. Whether Mrs. Diawara Needed to Amend Her Standard Form 95 Prior to the Issuance of Her Denial Letter

Citing *Robison v. United States*, 746 F. Supp. 1059 (D. Kan. 1990), the United States argues that Mrs. Diawara could have amended her administrative claim at any point prior to the administrative decision, and therefore she should be limited to the amount filed in her Standard Form 95. Upon closer analysis, the Court discerns that was not the issue addressed in *Robinson*. Rather, the aspect of *Robinson* cited by the United States addressed the question of "whether the

5

date of filing the administrative claim or the date of decision of the administrative claim constitutes the 'time of presenting the claim' under § 2675(b)." *Robinson*, 746 F. Supp. at 1063. Unlike here, the plaintiff in *Robinson* had amended his administrative claim prior to the agency's final decision, thus requiring the court to determine whether the time of presenting the claim meant the time the plaintiff filed his amended claim or the time of the agency's decision. Noting that "'[p]resent' means to offer, file, submit or introduce," the court concluded that the "plaintiff's administrative claim was presented when [the] plaintiff submitted his amended claim." *Id.*

Therefore, at most, *Robinson* stands for the proposition that arguably Mrs. Diawara *could* have amended her claim prior to the USPS's final decision; *Robinson* does not hold that a plaintiff in a position such as Mrs. Diawara's *must* have amended her claim. Having found no additional precedent that suggests otherwise, the Court finds Mrs. Diawara had no duty to amend her claim prior to the USPS issuing its final decision.

### B. Whether Mrs. Diawara Reasonably Could Have Known the Severity of Her Injury at the Time She Filed Her Standard Form 95

"Diagnoses which are merely cumulative and confirmatory of previous diagnoses do not constitute either 'newly discovered evidence' or 'intervening facts,' for the purposes of [the FTCA]." *Powers v. United States*, 589 F. Supp. 1084 (D. Conn. 1984) (quoting *Kielwien v. United States*, 540 F.2d 676, 680–81 (4th Cir. 1976)). "However, when a plaintiff does not know fully the 'medical extent of his injuries and expenses' at the time of his administrative complaint, the exceptions to § 2675(b) are triggered." *Id.* (citations omitted).

Here, the facts demonstrate that Mrs. Diawara did not know the severity of her injuries at the time she filed her Standard Form 95 on July 27, 2017. Between the time of the accident and the filing of her Standard Form 95, she was on short-term disability only to recover from a rotator cuff surgery. This disability leave lasted less than three months, after which Mrs. Diawara returned

6

to full-time work. Although she worked partially from home, she continued to work throughout her various treatments from her return to work in May 2016 up until December of 2017, when her pain worsened and she applied for short-term disability. At the time of her July 27, 2017 filing, Mrs. Diawara was still employed, was working five days a week, and had not taken any additional leave. Mrs. Diawara may have known that she might need further medical treatment, but she did not have reason to foresee that her condition would worsen to the point that almost two years later on May 22, 2019 the Social Security Administration would eventually declare her occupationally disabled.

For these reasons, the Court grants Plaintiffs' motion to amend in order to increase the amount of damages sought beyond that which was claimed on Mrs. Diawara's initial Standard Form 95.

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs have also moved for partial summary judgment on two issues:

1. That the United States, by and through its agent Amanda Galbreath, was negligent in causing the car accident; and

2. That negligence was a substantial factor in causing harm to Plaintiffs.

At oral argument, all parties agreed that the United States, by and through Ms. Galbreath, was negligent in causing the car accident. Plaintiffs then withdrew the remainder of their motion for summary judgment as to whether that negligence was a substantial factor in causing the alleged harm. Therefore, the Court grants the motion to the extent it seeks summary judgment on the issue of whether the United States, by and through its agent Amanda Galbreath, was negligent in causing the car accident. The remainder of the motion is moot.

## DEFENSE MOTION *IN LIMINE* TO EXCLUDE, IN PART, EXPERT TESTIMONY AND REPORT

Dr. Bruce Grossinger is a neurologist board-certified in psychiatry and neurology, pain medicine, and electrodiagnostic medicine. Mrs. Diawara first began receiving intermittent treatment from Dr. Grossinger and his brother, Dr. Steven Grossinger,[2] at Grossigner NeuroPain Specialists in July 2015, a month before the vehicle accident at issue in this case. After the accident, Grossinger NeuroPain Specialists continued to treat Mrs. Diawara on a regular basis. Plaintiffs designated Dr. Bruce Grossinger as a non-retained witness who may present expert testimony, and the United States deposed him regarding his treatment of Mrs. Diawara and his expert report. The United States now moves *in limine* to exclude any expert testimony or report from Dr. Grossinger that opines outside of the field of neurology.

### I. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court "imposed upon district courts the role of a gatekeeper, in order to 'ensure that any and all scientific evidence is not only relevant, but reliable.'" *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 198

---

[2] All references in this Memorandum to "Dr. Grossinger" refer to Dr. Bruce Grossinger.

8

F. Supp. 2d 598, 601–02 (E.D. Pa. 2002) (*quoting Daubert,* 509 U.S. at 589). "When 'faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (alteration in original) (quoting *Daubert,* 509 U.S. at 592). This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on . . . 'technical' and 'other specialized' knowledge." *Id.* (alteration in original) (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999)).

Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Id.* (quoting *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000)). "The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." *Id.* (citing *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999)).

"Qualification requires 'that the witness possess specialized expertise.'" *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir. 2008) (citing *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003)). "A 'broad range of knowledge, skills, and training qualify an expert.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir. 1994)). An "expert's testimony is not limited to the area in which he or she [ ] specialize[s]," but "the party offering the expert must demonstrate that the expert has the necessary expertise." *Ferris v. Pa. Fed'n Bhd. of Maint. of Way Emps.,* 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001) (citing *Burton v. Danek Med., Inc.,* No. 95-5565, 1999 WL 118020 (E.D. Pa. Mar. 1, 1999) (finding that neurologist was not qualified to testify about cause of injury in a case involving spinal fusion surgery where neurologist had no experience or training in the area of spinal surgery)). "If the expert testimony

9

falls outside a witness's expertise, the court should exclude it." *Id.* (citing *In re Diet Drugs Prods. Liab. Litig.*, No. MDL1203, 2000 WL 962545, at *3 (E.D. Pa. June 28, 2000)).

## II. Discussion

The United States does not challenge Dr. Grossinger's qualifications in neurology. However, the United States claims that Dr. Grossinger rendered opinions that crossed over into fields outside of his expertise, including orthopedics, neurosurgery, and vocational rehabilitation. The United States argues that Dr. Grossinger is not qualified to testify on these other specialties, and notes that Plaintiffs have identified other treatment providers who may offer testimony in these particular other medical fields. Therefore, the United States argues, permitting Dr. Grossinger to testify outside of the field of neurology would be improper under Rule 702 and a waste of time and resources.

Plaintiffs respond that an expert is "permitted to rely on the findings of other experts in forming his conclusions." *Snider v. Sterling Airways, Inc.*, 758 F. App'x 283, 288 (3d Cir. 2018). Plaintiffs argue that Dr. Grossinger based his expert opinions on his physical neurological examination of Mrs. Diawara; her treatment from his medical practice; his review of other medical records in her file, including records relating to treatment from other healthcare professionals; and his own extensive medical experience. Plaintiffs state that Dr. Grossinger is not opining outside of the scope of his specialized knowledge, training, and expertise, but rather is providing a comprehensive and informed review of her injuries.

### A. Orthopedics

The United States asserts that Dr. Grossinger has no formal education or experience as an orthopedic surgeon, has not published any related articles, has never performed orthopedic surgeries generally, and has never performed the specific type of rotator cuff surgery Mrs. Diawara

had performed. The United States also argues that a doctor other than Dr. Grossinger determined the appropriate treatment options for Mrs. Diawara's alleged orthopedic injuries. In addition, the United States directs the Court's attention to a Pennsylvania Court of Common Pleas decision holding that Dr. Grossinger was found not qualified to testify on orthopedic surgery. *See generally Fanuiel v Roxborough Mem'l Hosp.*, No. 110802022, 2013 WL 6143650 (Pa. Com. Pl. Oct. 29, 2013).

Although the Court of Common Pleas case cited by the United States was a medical malpractice case, which has additional requirements for medical expert testimony not present here, two of that court's observations are particularly applicable to the case at hand: (1) "Dr. Grossinger's report does not explain why his specialties qualify him to opine on . . . orthopedic surgery," and (2) there is "no evidence indicating the board certifications held by Dr. Grossinger in Psychiatry and Neurology [are] the same or similar to those of . . . orthopedic surgery." *Fanuiel*, 2013 WL 6143650, at *3.

After weighing the information made available to the Court and respecting the pertinent case law and evidentiary rules, the Court concludes that Dr. Grossinger will not be permitted to render expert opinion on the topic of Mrs. Diawara's orthopedic injuries. Although it is sensible that he reviewed Mrs. Diawara's full medical file and Mrs. Diawara's other treating physicians' findings, "[t]he Federal Rules of Evidence do not permit experts to simply 'parrot' the ideas of other experts or individuals." *In re Wagner*, No. 06-01026, 2007 WL 966010, at *4 (E.D. Pa. Mar. 29, 2007) (citation omitted). Here, Dr. Grossinger's opinions related to Mrs. Diawara's orthopedic injuries appear to be based solely on the evaluations and reports prepared by her orthopedic treatment providers. Therefore, should Plaintiffs wish to offer expert testimony detailing the

nuances of Mrs. Diawara's orthopedic injuries, they must rely on an expert with the appropriate qualifications rather than Dr. Grossinger.

## B. Neurosurgery

In a similar vein, the United States argues that Dr. Grossinger is not trained or educated in spinal fusion surgery, is not a member of a neurosurgery organization, and has no research or academic studies related to neurosurgery. The United States also provides case illustrations showing that the Eastern District of Pennsylvania has permitted a neurologist to testify about spinal fusion surgery where the doctor also had extensive experience and qualifications in neurosurgery but has precluded neurologist testimony on the topic of spinal implants where the doctor had no training or experience performing the spinal fusion surgery in question. *Compare Taylor v. Danek Med, Inc.*, No. 95-7232, 1999 WL 310647 (E.D. Pa. May 10, 1999) *with Burton*, 1999 WL 118020 *and O'Brien v. Sofamar*, No. 96-8015, 1999 WL 239414 (E.D. Pa. Mar. 30, 1999).

Having reviewed Dr. Grossinger's curriculum vitae, deposition testimony, and report, the Court concludes that he does not have formal professional qualifications related to neurosurgery. Nonetheless, Dr. Grossinger did testify that "neurosurgeons and neurologists work together," "see the exact same patients" and "same disease," and the "only difference" is that a neurosurgeon would be the one "to go and actually open up the patient and operate using a scalpel and sutures and titanium plates and rods." Grossinger Dep. 12:16–24. There is nothing in the record or common sense to question this. Based on this legitimate overlap, Dr. Grossinger is qualified to talk about Mrs. Diawara's neurological treatment and how or why her symptoms required surgery, and to what extent he was involved in that determination. However, there is a line between that testimony and perhaps an effort to offer more far-reaching testimony that discusses actual surgical treatment, which Dr. Grossinger admittedly does not perform. To the extent that Plaintiffs seek

12

testimony that crosses that line and ventures into Mrs. Diawara's neurosurgical treatment, Dr. Grossinger is not qualified to provide that expert testimony.

### C. Vocational Rehabilitation

Finally, the United States claims that vocational rehabilitation determinations should be left to vocational rehabilitation experts, who typically require a specialized education and skillset. Although Dr. Grossinger may be qualified to discuss Mrs. Diawara's alleged neurological limitations, the United States asserts that he cannot determine how those limitations do or do not impact her employability. In support, the United States cites a Pennsylvania Court of Common Pleas case that permitted a plaintiff in a motor vehicle tort case to have Dr. Grossinger offer expert opinion on her injuries and physical limitations or restrictions but precluded the offering of Dr. Grossinger as a vocational expert. *See* Dec. 7, 2012 Order, *McClinton, B. v. Howard, G.*, No. 2011-003882 (Pa. Com. Pl.).

The Diawaras respond by citing the portion of Dr. Grossinger's deposition testimony in which he explains the basis of his opinion that Mrs. Diawara is permanently disabled from employment. However, portions of this same testimony demonstrate that Dr. Grossinger's conclusions related to Mrs. Diawara's employability are speculative and beyond the scope of his specialized knowledge. *See, e.g.*, Grossinger Dep. 57:9–17 ("And [the pain] also inhibits her ability to work as a very high level person as a business analysist. I *could imagine* it's a very high level employment that requires her to be alert and not distracted from her pain.") (emphasis added); *id.* at 59:14–15 ("I *can't imagine* that she would not have to sustain greater than 15 minutes [sitting] at a time in that job.") (emphasis added). Dr. Grossinger does not present any experience or expertise to support his conclusions about the various demands of Mrs. Diawara's employment.

As a neurologist who treated Mrs. Diawara, Dr. Grossinger is certainly qualified to provide expert testimony related to her neurological treatment, neurological injuries, and any ways in which those neurological injuries cause her various limitations. However, even in light of the Third Circuit Court of Appeals' liberal interpretation of the specialized knowledge requirement, neither Dr. Grossinger's experience nor his opinion in this case demonstrate that he is qualified to offer an opinion on how those neurological symptoms or limitations impact her employability. Those opinions are of the sort that should be left to the judgment of a vocational expert. *See, e.g., Boyer v. City of Philadelphia*, No. 13-6495, 2018 WL 4252378, at *3 (E.D. Pa. Sept. 6, 2018) (finding witness qualified to render expert testimony regarding vocational prospects where the witness worked as a Vocational and Rehabilitation Specialist for 33 years, had a master's degree in Psychological Services, and was certified by the American Board of Vocational Experts). Dr. Grossinger will not be permitted to testify about Mrs. Diawara's vocational prospects.

For these reasons, the Court grants the United States' motion *in limine*. Dr. Grossinger will permitted to testify about Mrs. Diawara's neurological treatment, her non-neurological treatment to the extent it is relevant to his service as her neurologist, and her neurological symptoms and how they may impact her ability to perform different tasks. He will not be permitted to render expert testimony on the details or processes of any non-neurological medical treatment Mrs. Diawara received or Mrs. Diawara's employability.

## Conclusion

For the foregoing reasons, (1) Plaintiffs' motion for leave to amend the ad damnum clause of Mrs. Diawara's Standard Form 95 is granted; (2) Plaintiffs' motion for partial summary judgment is granted in part and deemed moot in part; and (3) the United States' motion *in limine*

to exclude, in part, the testimony and report of the Diawaras' expert Dr. Bruce Grossinger is granted. An appropriate order follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE