## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER DIAWARA** *et al.*, | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES** *et al.*, | : | **No. 18-3520** |
| *Defendants* | : | |

## A M E N D E D   M E M O R A N D U M

PRATTER, J.                                                                   AUGUST 17, 2021

Jennifer Diawara and her family were involved in an accident with a United States Postal Service truck operated by Amanda Galbreath. Ms. Diawara, on behalf of herself and her two children, J.D. and R.D., brought suit under the Federal Tort Claims Act. The parties concede that the accident was caused by Ms. Galbreath's negligence. The remaining issues are causation and damages. Ms. Diawara contends that the accident caused her to tear her rotator cuff in her shoulder, and caused injuries to her spine which have left her disabled. The United States maintains that while the accident may have caused a shoulder strain, otherwise Ms. Diawara's physical disability was caused by preexisting conditions.

The Court presided over a six-day bench trial, and later reviewed the parties' proposed findings of fact and conclusions of law. Upon consideration of these proceedings, filings, the evidence presented, and the important credibility considerations noted here, the Court concludes:

(1)     Ms. Diawara did not meet her burden to produce substantial evidence that Ms. Galbreath's negligent actions aggravated any of Ms. Diawara's preexisting injuries and physical conditions.

(2)     Even if Ms. Diawara had proved that the accident caused her injuries, she did not present substantial evidence, in the form of a competent vocational expert, proving the amount of damages for lost earnings, lost services, or future medical care.

(3)     Because Ms. Galbreath's negligence did not aggravate Ms. Diawara's preexisting injuries, Ms. Diawara is not entitled to damages for pain and suffering, humiliation, mental anguish, disfigurement, or loss of enjoyment of life.

(4)     Ms. Diawara proved that Ms. Galbreath's negligence caused her to incur medical expenses on August 13, 2015 in the amount of $147.70.

(5)     Plaintiff R.D. is entitled to recover medical expenses incurred on August 13, 2015 in the amount of $933.93.

(6)     Plaintiff R.D. did not prove that he was entitled to any damages for past pain and suffering, mental anguish, and loss of enjoyment of life.

(7)     Plaintiff J.D. is entitled to recover medical expenses incurred on August 13, 2015 in the amount of $642.75.

(8)     Plaintiff J.D. did not prove that he was entitled to any damages for past pain and suffering, mental anguish, and loss of enjoyment of life.

FINDINGS OF FACT

## I.     The August 13, 2015 Accident

1.     On August 13, 2015, at approximately 11:20 a.m., Jennifer Diawara and her family were stopped at a red light at the intersection of Route AC and US Route 63 when their family minivan was struck in the rear by a mail delivery truck operated by Amanda Galbreath and owned by the United States Postal Service.  *See* Doc. No. 94 at 17:6-22; Doc. No. 91 at 5:10-8:11; Ex. P16 at 15-18.

2.      Plaintiffs Jennifer Diawara, R.D. and J.D. were passengers in a vehicle operated by Ms. Diawara's husband, Alpha Diawara, and all were restrained by seatbelts.  *See* Doc. No. 94 at 18:3-13, 19:6-9.  *See also* Doc. No. 91 at 5:10-7:6.

3.      Ms. Diawara was wearing a typical harness style seatbelt over her right shoulder, with the strap being buckled down on her left side.  *See* Doc. No. 94 at 18:3-6.

4.      At the time of the collision, Ms. Galbreath was employed by the United States Postal Service in the Tiger Station in Columbia, Missouri, as a City Carrier Assistant.  *See* Ex. P22 at 1.  *See also* Doc. No. 53 at 1.

5.      The United States does not dispute that Ms. Galbreath caused the rear-end collision.  *See* Doc. No. 90 at 9:10-13.  *See also* Doc. No. 53 at 1.

6.      Neither Plaintiffs' minivan nor the United States Postal Service ("USPS") truck sustained any visible damage, nor did airbags in either vehicle deploy.  *See* Ex. P59 at 9; Ex. P11 ("Photos of Accident Scene").

7.      At the time of the collision, Ms. Diawara was 41 years old, J.D. was 11 years old, and R.D. was 6 years old.  *See* Doc. No. 94 at 5:11-13.  *See also* Doc. No. 53 at 2.

8.      At trial, Alpha Diawara described the impact from the USPS truck as a "big loud bang."  *See* Doc. No. 91 at 7:23-8:1.

9.      At the very time of impact, Ms. Diawara testified that she had turned and was looking over her left shoulder to make sure that her three children in the back seat were wearing their seatbelts.  *See* Doc. No. 94 at 18:9-13.

10.     There was no warning that the rear-end collision was about to occur.  *See* Doc. No. 94 at 17:23-25.

11.     Ms. Diawara testified that after the accident her children, who were in the backseat of the car, were crying and that it was "complete chaos." *See* Doc. No. 94 at 19:12.

12.     Alpha Diawara called the police shortly after the accident. *See* Doc. No. 91 at 5:25.

13.     Police Officer Gene Williams responded to the scene of the accident. *See* Doc. No. 91 at 29:4-8.

14.     Officer Williams asked Alpha Diawara questions about the accident. Doc. No. 91 at 29:9-11.

15.     Officer Williams drafted a police report regarding the motor vehicle accident. *See* Ex. D20 at 5. *See also* Doc. No. 91 at 29:9-11.

16.     The police report noted that "no injuries were reported." *See* Ex. D20 at 5. *See also* Doc. No. 91 at 32:25-33:2.

17.     Rick Ayers, a USPS manager, also arrived on the scene of the accident. *See* Doc. No. 91 at 8:12-20.

18.     Mr. Ayers asked Alpha Diawara questions about the accident at the scene of the accident. *See* Doc. No. 91 at 34:7-12.

19.     An ambulance from Boone Hospital Center Ambulance Emergency Medical Service ("Boone EMS") also arrived at the scene. *See* Doc. No. 91 at 9:2-3; Doc. No. 94 at 46:21-23; Ex. P59 at 9.

20.     According to Boone EMS personnel, Ms. Diawara, R.D., J.D., and S.D. were "alert and oriented," and Ms. Diawara "did not appear to have any head or neck pain." Ex. P59 at 9.

21.     When asked by Boone EMS personnel where he had pain, R.D. stated that it was in "his back." *See* Ex. P153 at 7. Upon palpation, R.D. "did not grimace or appear to have any pain upon touch" and "later stated that he didn't" have any pain. *Id.*

22.     After the collision, R.D. was transported by Boone County Hospital EMS to the Emergency Department at Women and Children's Hospital in Columbia, Missouri.  *See* Doc. No. 94 at 20:18-20.  *See also* Ex. P153 at 7.

23.     R.D. walked to and climbed into and out of the ambulance without assistance.  *Id.*

24.     Ms. Diawara "initially declined" treatment from Boone EMS.  *See* Doc. No. 93 at 47:21-22; Ex. P59 at 9.

25.     Ms. Diawara told the Boone EMS responders that she was taking medication for back problems and that she had chronic back pain, musculoskeletal disease, degenerative disc disease, and a bulging disc.  *See* Doc. No. 93 at 47:18-21; Ex. P59 at 9.

26.     Boone EMS personnel observed that Ms. Diawara was "able to speak fine, turn her head without any pain, and did not have any tingling or numbness anywhere."  *See* Doc. No. 93, 47:15-16; Ex. P59 at 9.

27.     Ms. Diawara conceded that when the ambulance arrived, she was able to get into the ambulance unassisted, and walk unassisted into the ER at Columbia Women's and Children's Hospital upon arrival.  *See* Doc. No. 94 at 47:2-10.

28.     After EMS personnel arrived at the accident scene, they placed J.D. in a neck brace. *See* Doc. No. 94 at 20:24-25.

## II.     Post-Accident Care

29.     At Columbia Women's and Children's Hospital, R.D. "reported to be c/o neck pain but no neck pain at this time. c/o hand pain. . . . The degree at onset was minimal. The degree at present is minimal."  *See* Ex. P154 at 2.

30.     After examining R.D., the hospital prescribed Ibuprofen for any future pain and discharged him shortly thereafter.  *Id.* at 5, 17.

5

31.     J.D. entered the hospital "with a c collar on c/o neck pain. no head injury. no numbness, weakness. no other injuries." *See* Ex. P158 at 2.

32.     At the time of the accident, Ms. Diawara was already taking a prescription of Oxycodone, 10 milligrams as needed. *See* Doc. No. 94 at 48:12-16.

33.     Although Ms. Diawara stated that she had back and shoulder pain at the hospital (Doc. No. 94 at 47:14-17; Ex. P60 at 1), Ms. Diawara described her pain as "[t]he degree at onset was minimal. The degree at present is minimal," (Doc. No. 93 at 49:6-7; Ex. P60 at 1).

34.     After her examination, the hospital gave Ms. Diawara a Dilaudid injection, prescribed Acetaminophen-Oxycodone 325 milligrams for any future pain, and discharged Ms. Diawara shortly thereafter. *See* Doc. No. 93 at 50:13-23; Doc. No. 94 at 48:20-22; Ex. P60 at 3, 51, 54.

35.     Ms. Diawara testified that the hospital also provided her with a splint for her shoulder. Doc. No. 94 at 48:3-8. The medical records from Columbia Women's and Children's Hospital do not include any references to a splint.

36.     After an x-ray of his right hand was performed, R.D. was diagnosed with a right hand contusion and was discharged with a splint on his right hand. *See* Ex. P154 at 6. *See also* Doc. No. 94 at 22:2-3, 23:2-9.

37.     R.D. was instructed by the emergency department to keep the hand splint on for a few days following the accident. *See* Doc. No. 94 at 23:2-25. *See also* Doc. No. 91 at 17:15-24.

38.     The USPS does not contest proximate causation as to the injuries of minor Plaintiff R.D., and have stipulated to economic damages in the amount of $933.93. *See* Doc. No. 91 at 17:25-18:4.

39.     After an x-ray of his cervical spine was performed, physicians in the emergency department diagnosed J.D. with a neck strain and discharged him. *See* Ex. P158 at 3-4, 12.

40.     J.D. was instructed by the emergency department to keep the neck collar on for a few days following the accident. *See* Doc. No. 94 at 23:2-25; Doc. No. 91 at 17:15-24.

41.     The USPS does not contest proximate causation as to J.D.'s injuries, and the parties have stipulated to economic damages in the amount of $642.75.  *See* Doc. No. 90 at 9:10-13; Doc. No. 91 at 17:25-18:4.

42.     According to the EMS transport record, EMS personnel arrived at the scene at 11:26 p.m., departed for the hospital at 11:48 p.m., and arrived at Women's and Children's emergency department at 11:55 p.m.  *See* Ex. P59 at 8.

43.     Ms. Diawara was discharged from the emergency room that afternoon.  *See* Ex. P59 at 4.

44.     Plaintiffs were all discharged from Columbia Women's and Children's Hospital after "[a] couple of hours."  Doc. No. 94 at 21:11-13.

## III.    Plaintiffs Continue Their Vacation

45.     Plaintiffs continued their family vacation immediately after leaving the hospital on the day of the accident.  *See* Doc. No. 91 at 11:9-10, 38:10-14; Doc. No. 94 at 49:8-17.

46.     On August 13, 2015, the Diawaras drove from Columbia Missouri to Bentonville, Arkansas.  *See* Doc. No. 91 at 11:9-10, 38:15-17; Doc. No. 94 at 49:18-20.

47.     They next stopped in Fort Worth, Texas.  *See* Doc. No. 91 at 38:18-19.

48.     They then drove to New Orleans, Louisiana.  *See* Doc. No. 91 at 38:20-22; Doc. No. 94 at 49:23-50:1.

49.     They were in New Orleans, Louisiana on August 19, 2015, four days after the accident.  *See* Doc. No. 94 at 52:3-9.

7

50.     They next drove to Florida, staying in Miami and Orlando.  *See* Doc. No. 91 at 38:23-39:3; Doc. No. 94 at 50:2-7.

51.     While in Orlando, Plaintiffs visited Universal Studios Theme Park.  *See* Doc. No. 91 at 5:2-4; 12:3-5; Doc. No. 94 at 24:12-13, 50:8-10, 53:22-24.

52.     Ms. Diawara testified that she went to an urgent care facility in Florida for ongoing "extreme pain" in her shoulder, but that further diagnosis was declined because she was already diagnosed at the emergency room in Missouri.  *See* Doc. No. 94 at 24:17-25:3.

53.     Alpha Diawara claimed that for the remainder of the family vacation after the motor vehicle accident, Ms. Diawara "could not go out and do the things we'd always do together as a family."  Doc. No. 91 at 12:9-12.

54.     Alpha Diawara similarly testified that "[i]f she'd get out of the hotel room, [Ms. Diawara] would just sit on the bench at the Universal" Studios Theme Park.  *See* Doc. No. 91 at 12:23-24.

55.     However, the evidence confirmed that Ms. Diawara was able to walk around Universal Studios, and go to the pool at the Universal Orlando Resort.  Doc. No. 94 at 24:14, 51:5-7, 53:12-16.

56.     Ms. Diawara also went to the beach with her family while in Florida.  *See* Doc. No. 94 at 51:11, 53:8.

57.     Ms. Diawara did not wear a shoulder splint as Columbia Women's and Children's Hospital ER purportedly prescribed, and even when she did wear it, she "took it off at times."  *See* Doc. No. 94 at 54:10-14.

58.     Plaintiffs finally returned from their vacation on August 29, 2015, about 16 days after the accident.  *See* Doc. No. 91 at 17:3.

59.     During their entire family vacation, Ms. Diawara traveled in the minivan with her family.  *See* Doc. No. 91 at 39:7-9.

60.     In the two years following the motor vehicle accident, Ms. Diawara went on four more separate trips to amusement parks in Florida.  *See* Doc. No. 91 at 40:13-15.

61.     In July 2016, Ms. Diawara and her family again vacationed at Universal Studios Theme Park in Orlando, Florida.  *See* Doc. No. 91 at 39:16-19.

62.     In November 2016, Ms. Diawara and her family vacationed at Busch Gardens in Tampa, Florida.  *See* Doc. No. 91 at 40:7-9.

63.     In July 2017, Ms. Diawara and her family vacationed at Walt Disney World in Orlando, Florida.  *See* Doc. No. 91 at 40:10-12.

64.     In September 2017, Ms. Diawara and her family visited the beach in Wildwood, New Jersey.  *See* Doc. No. 94 at 70:12-19.

65.     When questioned about her Facebook post from that September 2017 Wildwood trip that read "I might hit the boards tonight," Ms. Diawara testified by responding only "I see it." *See* Doc. No. 94 at 70:12-22.

IV.     **Testimony Regarding Ms. Diawara's Neck and Back Injuries**

        **A.  Dr. Merkler's Testimony**

66.     At trial, USPS presented the testimony of Alexander E. Merkler, MD ("Dr. Merkler"), a board-certified neurologist and Assistant Professor of Neurology and Neuroscience at Weill Cornell Medical College and the Brain and Mind Research Institute.  *See* Doc. No. 93; Doc. No. 95.

67.     Dr. Merkler treats patients who have been injured in motor vehicle accidents as part of his clinical practice on a daily basis. *See* Doc. No. 93 at 7:12-14.

68.     Dr. Merkler has also worked specifically with patients who have cervical strains, myofascial pain, multilevel disc osteophytes, foraminal narrowing of the spine, complaints of radiculopathy, and degenerative disc disease.  *Id.* at 6:11-23.

69.     USPS's neurology expert, Dr. Merkler prepared two expert reports dated September 26, 2019 and October 14, 2019.  He has served previously in litigation as a neurology expert for both plaintiffs and defendants.  *Id.* at 7:18-21, 8:9-9:7.

70.     Based on Dr. Merkler's review of Ms. Diawara's extensive medical records, as well as deposition testimony and Plaintiffs' expert reports, he concluded to a reasonable degree of medical certainty that the August 13, 2015 motor vehicle accident "neither caused nor exacerbated nor further injured any of [Ms. Diawara's] preexisting injuries or led to any new symptoms."  *Id.* at 14:6-16.

71.     Dr. Merkler opined that the best way to detect degenerative spinal disease is by radiography, including MRIs, the most sophisticated test.  Ms. Diawara underwent multiple MRIs prior to the August 13, 2015 motor vehicle accident, including one dating back to April 6, 2004.  *Id.* at 15:8-19.

72.     The April 6, 2004 MRI of Ms. Diawara's lumbar spine showed that she had "L3-L4 disc degeneration and desiccation with minimal annular bulging and endplate osteophyte formation without central or neural foraminal narrowing."  *Id.* at 16:6-11; Ex. D3 at 48.

73.     Dr. Merkler also testified regarding a June 10, 2008 Taylor Hospital record, which reflected that Ms. Diawara visited the emergency room after experiencing a fall.  At that visit, she complained of neck and shoulder pain that radiated down her arm.  *See* Doc. No. 93 at 17:6-23; Ex. P61 at 4.

74.     Ms. Diawara also underwent an x-ray of her cervical spine following her fall in June 2008.  The x-ray revealed an intervertebral space narrowing at the C4 and C5 level.  *See* Doc. No. 93 at 20:7-20; Ex. D3 at 44.

75.     Dr. Merkler opined that the significance of the intervertebral space narrowing at C4 to C5 level is "the classic or typical feature of degenerative spinal disease" and that Ms. Diawara had this spinal disease dating back at least to 2008.  Doc. No. 93 at 20:23-21:13.

76.     Ms. Diawara went on short-term disability from her Systems Analyst position at AmeriHealth Caritas in 2009 after she threw out her back.  *See id.* at 21:20-23, 22:4-6.

77.     Dr. Merkler also opined that there can be long-term consequences of throwing out one's back, including severe back pain from sprain or strain on the muscles or ligaments, a slipped disc, or nonspecific pain.  *See id.* at 22:23-23:13.

78.     Dr. Merkler also reviewed 2011 records from Dr. Richard Buonocore, who performed Ms. Diawara's carpel tunnel surgery.  Dr. Merkler opined that Dr. Buonocore's notes were significant because they stated that Ms. Diawara had "chronic severe back pain secondary to an automobile accident for which she is requiring escalating dosage of Percocet therapy and has been on that particular medication for greater than 10 years."  *Id.* at 23:22-24:6; Ex. P64 at 31.  Dr. Merkler believed that Dr. Buonocore was referring to Ms. Diawara's 2000 motor vehicle accident. *See* Doc. No. 93 at 23:22-24:6; Ex. P64 at 31.

79.     Ms. Diawara first started consulting pain management specialist Dr. Sherry Jose and Physician Assistant Michelle Raeuber for chronic lower back and cervical pain in June 2013. *See* Doc. No. 93 at 25:25-26:9.

80.     At her first visit with them on June 19, 2013, Ms. Diawara stated that her chronic low back and cervical pain started in 2000 with a motor vehicle accident and described her pain as

"sharp and stabbing" and "10/10."  Ms. Diawara also stated that her pain was in her "midline lumbar spine with bilateral radiation."  Ex. P79 at 72.

81.    Dr. Merkler opined that Ms. Diawara likely had compression of the nerves in her lower back, causing radiating pain down her legs.  *See* Doc. No. 93 at 26:19-27:3.

82.    In June 2013, Ms. Diawara was taking various pain-management prescriptions, including Percocet, Valium, Soma, and Cymbalta.  *See* Ex. P79 at 70.

83.    Around this time, one of her physicians, Dr. Jose, referred Ms. Diawara to a psychologist, Bruce Eimer.  According to her medical records, Ms. Diawara recorded a lot of stress from her neck, back, and shoulder pain from a 2000 motor vehicle accident, as well as a shoulder dislocation in 2008.  *See* Doc. No. 93 at 27:24-28:16.  Dr. Eimer diagnosed her with "opioid dependence," "psychalgia," and "chronic pain disorder."  *See* Ex. P61 at 408.

84.    Following Ms. Diawara's visit with Dr. Eimer, she had another MRI of her lumbar spine on June 28, 2013.  This MRI revealed evidence of progressive degenerative spinal disease and decreased height signal intensity from L3-S1.  *See* Ex. D3 at 40.

85.    Dr. Merkler opined that, as compared to earlier radiographic studies, Ms. Diawara's spine showed a progression or worsening of her degenerative spinal disease.  *See* Doc. No. 93 at 30:21-25.

86.    Ms. Diawara continued to visit the Comprehensive Pain practice and Dr. Sherry Jose in August 2013.  She noted that she had chronic back pain and cervical pain starting with the 2000 motor vehicle accident.  She also described that epidurals were not relieving pain and that she was having radiating pain that was sharp and stabbing.  *See* Doc. No. 93 at 31:8-17.  She was also prescribed Oxycodone and OxyContin, two "very powerful pain medications."  *Id.* at 31:25-32:6; Ex. P79 at 71.

87.     In September 2013, Ms. Diawara continued to visit Comprehensive Pain for headaches and continued tingling and numbness.  She continued with biweekly or monthly visits for pain management through 2015.  *See* Doc. No. 93 at 32:13-33:3.

88.     On February 17, 2015, Ms. Diawara visited Michelle Raeuber at Comprehensive Pain.  At the time, six months before the motor vehicle accident at issue in this case, she complained of both chronic lower back pain starting in 2000 after a motor vehicle accident, as well as bilateral lumbar spine pain.  She also described that she had "pulled her back out" two weeks prior and was unable to sleep.  She noted that her pain medication was no longer working. *See* Doc. No. 93 at 33:9-34:2; Ex. P79 at 31.

89.     Dr. Merkler opined that Ms. Diawara's intervertebral disc disorders and other complaints were all "consistent with a longstanding cervical and low back pain secondary to degenerative spinal disease."  *See* Doc. No. 93 at 34:3-13.

90.     At a follow-up visit on February 23, 2015, Dr. Sherry Jose noted that Ms. Diawara tested positive for medications that were not prescribed to her (Trazodone and Oxcarbazepine), and that "[p]atient is aware that we will not accept this behavior anymore."  *See* Ex. P79 at 30. Because of Ms. Diawara's noncompliance, Dr. Jose referred her to Dr. Eimer for "pain medication compliance teaching."  *Id.*

91.     On April 7, 2015, four months before the August 13, 2015 motor vehicle accident, Ms. Diawara had an x-ray of her thoracic spine.  That x-ray showed that Ms. Diawara had mild scoliosis and "diffuse degenerative changes throughout the thoracic spine with mild disc narrowing."  Doc. No. 93 at 36:6-37:4.  *See also* Ex. D3 at 35.  Dr. Merkler opined that these findings were all consistent with degenerative disc disease.  *See* Doc. No. 93 at 37:5-6.

92.     On June 4, 2015, Ms. Diawara returned to Comprehensive Pain.  At that time, she complained of low back pain, cervical pain, numbness and tingling in both her hands and feet, headaches, pelvic pain, shoulder pain, and interrupted sleep.  She continued to take Oxycodone for pain management.  *See id.* at 37:10-38:1.

93.     When Ms. Diawara returned on July 7, 2015, approximately one month before the August 13, 2015 motor vehicle accident, she had similar complaints, including headaches for which she was going to see Dr. Steven Grossinger, a neurologist.  *See id.* at 38:6-14.  In his note, Dr. Jose wrote that Ms. Diawara's cervical pain was "midline and does not radiate."  *See* Ex. P79 at 11.

94.     Dr. Merkler interpreted Dr. Jose's note to mean that Ms. Diawara had pain in her neck region and her cervical region, but that, at the time, it did not radiate to other parts of her body like her arms or legs.  *See* Doc. No. 93 at 38:15-21.  He also confirmed that radiating pain can come and go, and that radiculopathy can come and go.  In essence, that is "part of the nature of it."  *See id.* at 38:22-40:1.

95.     Ms. Diawara returned to Dr. Jose on August 6, 2015, one week before the motor vehicle accident.  In his notes, he wrote that Ms. Diawara had numbness and tingling in both hands and feet and had cervical pain that was midline and did not radiate.  She described her neck pain as 7/10, for which she took Oxycodone to alleviate the pain.  *See* Ex. P79 at 11.  Dr. Merkler opined that although Ms. Diawara did not have neck pain that radiated down her arms, that type of radiating pain and radiculopathy can come and go.  *See* Doc. No. 93 at 44:1-45:3.

96.     Ms. Diawara also had numbness and tingling in both hands and feet one week before the August 13, 2015 motor vehicle accident. Dr. Merkler opined that these symptoms

represented a neuropathy, rather than a radiculopathy, and were likely due to degeneration of the nerves from systemic illness, likely diabetes, or thyroid conditions. *See id.* at 45:4-15.

97.     Dr. Merkler also noted that Ms. Diawara described her pain as "minimal." *See id.* at 49:4-9.

98.     At the emergency room, Ms. Diawara had an x-ray of her lumbar spine. The x-ray Report noted that there was "normal alignment of the lumbar vertebral bodies. Multilevel small anterior osteophytes are seen as well as early posterior osteophyte formation at L3-4. The intervertebral disc space heights are normal. There are multiple surgical clips scattered throughout the abdomen." Ex. P60 at 30.

99.     Dr. Merkler opined that the osteophyte formation at L3-4 was "another characteristic finding of chronic nontraumatic degenerative spinal disease. As arthritis sets in, you can get these bone spurs which is just basically outgrowth of bone and that's the term osteophytes when it occurs in the bones of the back." *See* Doc. No. 93 at 50:1-8.

100.     Dr. Merkler concluded that Ms. Diawara did not suffer any trauma from the August 13, 2015 accident and noted that Ms. Diawara was discharged shortly after arrival at the ER, and was given a Dilaudid injection as well as Oxycodone upon release. *See id.* at 50:9-23.

101.     Dr. Merkler also noted that after vacationing for two more weeks following the August 13, 2015 motor vehicle accident, Ms. Diawara returned to Pennsylvania in late August 2015. Ms. Diawara did not visit the emergency room during her trip or upon her arrival home in Pennsylvania. *See id.* at 50:24-51:17.

102.     Ms. Diawara's first visit with a neurologist following the August 13, 2015 motor vehicle accident was a previously scheduled appointment with Dr. Steven Grossinger. On September 17, 2015, Ms. Diawara complained of neck pain that went to her occipital region, or

occipital neuralgia, and neck pain.  She also said that she had radiating discomfort to her right arm and forearm as well as discomfort to her middle and lower back.  *See id.* at 52:2-14; Ex. D13 at 151.

103.    Dr. Merkler opined that her description of pain following the August 13, 2015 motor vehicle accident was no different from her description of pain pre-dating the accident.  *See* Doc. No. 93 at 52:15-18.

104.    On September 24, 2015, Ms. Diawara underwent an electromyography ("EMG") and nerve conduction study at Grossinger NeuroPain Specialists.  *See* Ex. P116 at 1-3.

105.    Dr. Merkler explained that the difference between an EMG and MRI is that an MRI is a radiographical study or a picture of the anatomy.  An EMG, on the other hand, is an electrophysiological test.  It looks at electricity on the nerves and muscles of arms and legs. *See* Doc. No. 93 at 53:9-15.

106.    Based on the EMG, there was a notation that Ms. Diawara had an "acute right C5-6 radiculopathy."  *See* Ex. P116 at 3.  Much of Plaintiff's theory of the case is tied to this notation and the word "acute" to argue that Ms. Diawara did not have the C5-6 radiculopathy before the August 13, 2015 motor vehicle accident.

107.    Dr. Merkler opined that EMG studies are actually comprised of two parts—the nerve conduction part evaluates electrical signals of the nerves themselves and the EMG evaluates muscle activity.  In this EMG study of Ms. Diawara, it showed that there was electric evidence of a C5-C6 radiculopathy, or that there was "some pathology at the level of C5-C6 and it's impinging or compressing or abnormalities within those nerve roots."  *See* Doc. No. 93 at 55:4-25.

108.    In terms of presentation of numbness or tingling, Dr. Merkler opined that this radiculopathy would cause both sensory and motor problems, including numbness, tingling,

electrical sensation in the upper arm and then the lower forearm all the way down into the thumb and index finger. For pain, it would cause numbness, tingling and pain going into the "upper arm, forearm, and the first two fingers of the hand, the thumb and the index finger." *See id.* at 54:2-15.

109. Ms. Diawara also underwent a cervical MRI on October 3, 2015. The MRI revealed multilevel degenerative changes in the cervical spine and mild developmental spinal stenosis. It also showed moderate disc osteophytes at C6-C7, which abut and flatten the central spinal cord. *See* Ex. D3 at 27.

110. Dr. Merkler opined that the multilevel disc osteophytes at C6-C7, facet hypertrophy, and foraminal narrowing are all consistent with chronic degenerative disc disease. He further testified that there was nothing on the October 3, 2015 MRI to indicate trauma from the August 13, 2015 motor vehicle accident. *See* Doc. No. 93 at 57:8-58:20.

111. Ms. Diawara continued to complain of neck and back pain that radiated, as well as occipital headaches. In 2016 and 2017, she continued to work despite having pain. In August 2017, Ms. Diawara had another series of MRIs. MRIs dated August 16, 2017 and December 15, 2017 also showed evidence of degenerative spinal disc disease in the lumbar region. *See id.* at 61:6-62:14; Ex. D3 at 19; Ex. D3 at 16.

112. Dr. Liliane Min, a rheumatologist, also diagnosed Ms. Diawara with cervical lumbar spine degenerative joint disease in the summer of 2017. *See* Doc. No. 91 at 62:15-63:12.

**B. Dr. Peter Le Roux's Testimony**

113. Ms. Diawara saw neurosurgeon Dr. Peter Le Roux in January 2018. Dr. Le Roux concluded after reviewing Ms. Diawara's MRIs that she had a C6-C7 spondylosis with narrowing of her canal or a C6-C7 disease. *See* Ex. D46 at 10-11. Dr. Merkler interpreted this to mean that Ms. Diawara's arthritic conditions were at the C6-C7 level and he opined that this was consistent with Ms. Diawara's degenerative disc disease. *See* Doc. No. 93 at 64:9-17.

114.   On March 15, 2018, Dr. Le Roux performed a C5-6 and C6-7 anterior cervical discectomy and fusion on Ms. Diawara.  Dr. Merkler agreed with Dr. Le Roux that Ms. Diawara needed this surgery to alleviate her pain.  However, he disagreed that the August 13, 2015 motor vehicle accident necessitated the surgery.  *See* Doc. No. 93 at 66:12-18, 68:5-17.

115.   Dr. Merkler testified that the discectomy and fusion surgery Ms. Diawara had is performed "[a]ll the time" to alleviate pain from degenerative disc disease.  *Id.* at 67:7-12.

116.   Dr. Le Roux, who performed Ms. Diawara's surgery, only saw Ms. Diawara between January 2018 and May 2018 in connection with this surgery.  *See* Ex. P197 ("LeRoux Tr.") at  95:5-8.

117.   Dr. Le Roux served as Ms. Diawara's treating physician and Plaintiffs' expert; he conceded that Ms. Diawara did very well following the March 2018 surgery he performed.  Le Roux Tr. at 114:7-115:14.

118.   In his post-operative note on May 3, 2018, Dr. Le Roux wrote that Ms. Diawara had seen "an improvement in many of her arm radicular symptoms and neck discomfort" and that she had "no neck pain [and] no trouble in [her] arms or hands."  *See* Ex. D46 at 36.

119.   Dr. Le Roux also testified that Ms. Diawara's surgery by him was "very satisfactory" and that her condition had improved.  *See* Le Roux Tr. at 117:13-18.

120.   Dr. Le Roux conceded that his assertion that the August 13, 2015 motor vehicle accident caused Ms. Diawara's worsening neurological condition assumed that there was flexion and extension of the neck that "were of a significant velocity."  *Id.* at 124:20-125:21.  However, Dr. Le Roux could only cite an emergency room record citing neck tenderness to support this conclusion.  *Id.* at 125:22-126:19.

121.    Dr. Merkler's testimony regarding Ms. Diawara's condition on the date of the accident directly contradicted Dr. Le Roux's finding.  Specifically, Dr. Merkler could find no evidence of significant flexion or rotation of Ms. Diawara's neck in deposition testimony or accident reports.  Nor could he find any evidence showing significant flexion in the ER records from Columbia Women's and Children's Hospital, including in the x-rays performed on the date of the accident at issue.  *See* Doc. No. 93 at 73:2-15.

122.    Dr. Le Roux could not recall, one way or the other, if he reviewed radiographical studies on the date of the accident—August 13, 2015.  Rather, he used an EMG performed "several weeks later and that shows acute denervation" to support his claim that her pain "started at the time of her accident."  Le Roux Tr. at 129:2-22.

123.    Dr. Le Roux also conceded, on cross-examination, that the risk of Ms. Diawara developing adjacent segment disease, which might require further surgery, was two percent (2%) per year.  *See id.* at 132:8-17.  He also agreed that there was no evidence of a Lhermitte phenomenon or myelopathy at Ms. Diawara's last exam.  *Id.* at 132:18-133:8.

124.    As for his estimate of the $100,000 cost of Ms. Diawara's future medical treatment for potential neck surgery, Dr. Le Roux was quick to state candidly that he does "not deal with finances" and conceded that he is "not in any way an economic expert."  *Id.* at 133:9-24.

125.    The Court did not find Dr. Le Roux's opinion that the August 13, 2015 accident caused Ms. Diawara's worsening neurological conditions persuasive for several reasons.  His assumption that Ms. Diawara experienced a high-velocity flexion and extension of the neck is without support in the record.  Dr. Le Roux did not examine or did not remember records from before the date of the accident, and therefore he was unable to testify whether examining those additional facts would have changed his opinion.  Dr. Le Roux also gratuitously opined on matters

outside of his area, apparently in an observable effort during his testimony to bolster Ms. Diawara's case.

### C. Dr. Zachary Hauser's Testimony

126.    Ms. Diawara continued to visit pain management physicians and rehabilitation medicine specialists following the surgery by Dr. Le Roux.  *See* Ex. P198 ("Hauser Tr.") at 76:24-77:9.

127.    In November 2018, Ms. Diawara returned to Dr. Zachary Hauser, a rehabilitation medicine physician, after a two-year gap in appointments.  *See id.*  Dr. Hauser also drafted an April 8, 2019 expert report for Plaintiffs.  *See id.* at 81:2-8.  In his report, Dr. Hauser concluded that Ms. Diawara had suffered "severe injury to her bilateral lower lumbar facet joints" and that she had "lumbar facet joint syndrome."  *Id.* at 81:12-18.

128.    Dr. Hauser conceded that there are many causes for lumbar facet joint syndrome, and that it can occur "without trauma."  *Id.* at 81:22-82:14.

129.    Dr. Hauser also conceded that he did not know whether Ms. Diawara had facet joint injury before the August 13, 2015 motor vehicle accident: "Yeah, I don't—I wasn't—I didn't examine her, so I couldn't comment on that."  *Id.* at 82:23-83:5.

130.    Dr. Hauser testified that when he examined Ms. Diawara and did a diagnostic medial branch block, she had "100% relief of her pain on those particular days" and "no symptoms related to radiculopathy."  He also explained that radiculopathy pain does not have to exist permanently, which is why he performed injections to ameliorate the reported pain.  *Id.* at 90:19-91:11.

131.    Dr. Hauser opined that Ms. Diawara's estimated cost of lumbar spine injections would be $1,500 per year; he estimated cost of physical therapy would be $1,200 a month; and he stated that the cost of pain medication would be $2,000 per year.  Dr. Hauser acknowledged that

he had no survey or publication to support his estimates; rather, he relied solely on his experience. *See id.* at 103:14-105:4.

132.    Dr. Hauser conceded that he is not a vocational expert and has no formal education in vocational rehabilitation.  *See id.* at 9:24-10:5.  He also admitted that he does not consult the Dictionary of Occupational Titles or Selective Characteristics of Occupations in his practice as a rehabilitation medicine specialist.  *See id.* at 10:6-14.

133.    When testifying about household chores that Ms. Diawara purportedly could and could not perform, Dr. Hauser noted his belief that that she "had not been on vacation in a number of years because of increased back pain" as being a relevant to his analysis.  *Id.* at 67:20-24.

134.    The Court did not find Dr. Hauser's testimony that the August 13, 2015 accident exacerbated Ms. Diawara's back injuries credible, because the record shows that Ms. Diawara's problematic symptoms predated the August 13, 2015 accident by many years, and did not noticeably worsen after the accident.  Rather, her symptoms began to rapidly worsen years after she had returned to work.  These facts much more likely demonstrate that her back injuries were due to progressive chronic degenerative disease, not a traumatic event.

**D.  Dr. James Bonner's Testimony**

135.    In January 2019, Ms. Diawara began to consult Dr. James Bonner, a rehabilitation medicine physician, for pain injections of her cervical spine. *See* Ex. P199 ("Bonner Tr.") at 11:20-12:1.

136.    Dr. Bonner also served as one of Plaintiffs' experts.  At his trial deposition, Dr. Bonner testified that the August 13, 2015 motor vehicle accident caused Ms. Diawara's two level cervical and lumbar radiculopathies.  Bonner Tr. at 38:8-20.  To form his opinion, he relied on Ms. Diawara's personal history as well as a physical exam "three and a half years after the accident."  *Id.* at 49:15-50:11.

137.    As a basis of his conclusion that Ms. Diawara's spinal condition worsened from the accident in question, Dr. Bonner relied upon a September 4, 2015 MRI.  Bonner Tr. at 15:11-16:3; Ex. P114 at 1.  Dr. Bonner opined that the September 2015 MRI showed that Ms. Diawara had a worsening of the condition at L5-S1 as compared to a previous MRI.  Bonner Tr. at 15:11-19; Ex. P114 at 1.

138.    Dr. Bonner opined that a "disc bulge and facet arthropathy, resulting in mild left foraminal narrowing . . . . prominent epidural fat in this region, which along with tapering, results in severe compression of the thecal sac" showed progression since Ms. Diawara's last MRI.  *Id.* at 15:11-19; Ex. P114 at 1.

139.    Testifying specifically about Plaintiffs' Exhibit 114, Dr. Bonner opined that his review of the September 4, 2015 MRI established, to "a reasonable degree of medical certainty" that the August 13, 2015 motor vehicle accident caused Ms. Diawara's compression of the thecal sac at L5-S1.  Bonner Tr. at 18:8-17.

140.    However, as it developed at trial, Dr. Bonner relied upon a September 4, 2015 MRI of a different patient in formulating his opinion.  *See* Bonner Tr. at 15:11-17:18.  Plaintiffs' Exhibit 114, which is the MRI Dr. Bonner relied upon, is not a medical record of Ms. Diawara; it is another patient's medical record, describing another patient's MRI of the thoracic spine.  *See* Ex. P114 at 1.

141.    The Court did not find Dr. Bonner's opinion testimony credible.  Dr. Bonner stated that he relied on Plaintiff's Exhibit 114, which belonged to a different patient—not Ms. Diawara.  Dr. Bonner also testified that his review of Ms. Diawara's medical records showed no sign of radiculopathy down her right arm before August 13, 2015, which is contradicted by the record.  *See* Bonner Tr. at 22:23-23:4.

### E.  Dr. Bruce Grossinger's Testimony

142.    Dr. Bruce Grossinger explained that he testifies as an expert in one to two cases per week and that he has testified as an expert for several decades.  *See* Ex. P195 ("Grossinger Tr.") at 12:1-6.

143.    For testifying as an expert, Dr. Grossinger charges between $3,500 and $4,000 per deposition, for total earnings as an expert witness of approximately $300,000 per year.  *See* Grossinger Tr. at 12:7-17.

144.    Dr. Grossinger claimed that Ms. Diawara underwent three MRIs of her lumbar spine before the August 2015 motor vehicle accident.  *See* Grossinger Tr. at 23:17-24:2.

145.    Crozer Radiology medical records demonstrate that Ms. Diawara underwent at least five lumbar MRIs before the motor vehicle accident, including on June 8, 2000 (Ex. D3 at 48), April 6, 2004 (Ex. D3 at 48), June 25, 2006 (Ex. D3 at 46), June 28, 2013 (Ex. D3 at 40), and April 12, 2015 (Ex. D3 at 31).

146.    Dr. Grossinger testified that a person with cervical radiculopathy might have radiating pain that can "come and go."  Grossinger Tr. at 112:17-20.

147.    Dr. Grossinger testified that the Plaintiffs' Exhibit 114 is an MRI report of Ms. Diawara's thoracic and lumbar spine, but Plaintiffs' Exhibit 114 is an MRI report concerning a different patient, not Ms. Diawara.  *See* Grossinger Tr. at 38:21-39:17; Ex. P114 at 1.

148.    Dr. Grossinger claimed that he reviewed both the MRI report and the underlying imaging in Plaintiffs' Exhibit 114.  *See* Grossinger Tr. at 39:5-7.

149.    Dr. Grossinger claimed that Plaintiffs Exhibit 114 "irrefutably shows evidence of an injury with impingement which is severe" and caused by the motor vehicle accident.  *See* Grossinger Tr. at 45:4-20, 129:12-130:24.

150.    Dr. Grossinger claimed that, in Plaintiffs' Exhibit 114, the radiologist's comparisons of MRIs from before and after the accident demonstrate that the accident caused her lumbar injuries.  *See* Grossinger Tr. at 44:9-22.

151.    Dr. Grossinger conceded that his brother (Dr. Steven Grossinger) signed the treatment note for Ms. Diawara's first appointment at Grossinger NeuroPain Specialists on July 28, 2015.  *See* Grossinger Tr. at 87:23-89:4; Ex. D13 at 35.

152.    Ms. Diawara is no longer a patient at Grossinger NeuroPain Specialists and her last appointment was in December 2018.  *See* Grossinger Tr. at 89:19-90:6.

153.    Dr. Grossinger could not recall which of Ms. Diawara's appointments he attended and did not attend.  *See* Grossinger Tr. at 90:7-11.

154.    Dr. Grossinger conceded that when he drafted his report, he reviewed only MRIs that post-dated the August 2015 motor vehicle accident.  *See* Grossinger Tr. at 91:8-16, 93:10-17.

155.    At the time Dr. Grossinger drafted his report, he erroneously surmised that Ms. Diawara's injuries from a 2000 motor vehicle accident subsided before the August 2015 motor vehicle accident.  *See* Grossinger Tr. at 95:6-96:4.

156.    In Ms. Diawara's intake form for Grossinger NeuroPain Specialists from July 28, 2015, she listed a "car accident in 5-28-2000" under the category of "significant injuries."  *See* Ex. D13 at 38.

157.    Dr. Grossinger agreed that Ms. Diawara had lumbar degenerative disc disease at least since 2006 (Grossinger Tr. at 104:2-4) and that degenerative disc disease worsens over time (Grossinger Tr. at 101:21-102:1).

158.    Ms. Diawara underwent an MRI of her lumbar spine on June 28, 2013.  *See* Ex. D3 at 40.   The corresponding radiologist's report concluded that the MRI showed "[d]ecreased

height/signal intensity from L3-S1, in keeping with moderate degeneration, progressed since 2006." *See* Ex. D3 at 40.

159.    Dr. Grossinger conceded that Ms. Diawara is properly categorized as obese, which can aggravate lumbar conditions.  *See* Grossinger Tr. at 104:5-12.

160.    Dr. Grossinger also conceded that an EMG does not show whether the cause of radiculopathy is traumatic or atraumatic.  *See* Grossinger Tr. at 106:13-16.

161.    Dr. Grossinger conceded that a person with cervical radiculopathy may or may not show symptoms including tingling in her hands, numbness in her hands, weakness in her upper extremities, and radiating pain.  *See* Grossinger Tr. at 107:6-109:23.

162.    According to a treatment note from Comprehensive Pain Specialists dated August 6, 2015 (seven days before the motor vehicle accident), Ms. Diawara complained of "numbness/tingling in both hands and feet."  *See* Ex. P79 at 7.

163.    Dr. Grossinger based his estimated cost of Ms. Diawara's future medical care only on his "own experience."  *See* Grossinger Tr. at 116:3-7.

164.    The Court has reason to question the efficacy of Dr. Grossinger's testimony because he rather frequently neglected in his testimony and evaluations certain facts or matters not supportive of Ms. Diawara's position.  For example, Dr. Grossinger erroneously testified that Ms. Diawara's medical records before August 2015 never mentioned that she had radiating neck pain: "No mention of radiating neck pain.  No mention.  Therefore, no cervical radiculopathy.  I think that's very compelling."   *See* Grossinger Tr. at 122:3-16.  He was in error.  *See, e.g.*, Ex. P79 at 11, 71-72; Ex. P61 at 4; Doc. No. 93 at 17:6-23, 31:8-32:6.

**F.  Dr. Merkler's Testimony Regarding Plaintiffs' Experts' Opinions**

165.    In connection with preparing his two expert reports, Dr. Merkler reviewed all of Plaintiffs' medical expert reports, as well as deposition testimony, in addition to Ms. Diawara's medical records and radiographic images.  *See* Doc. No. 93 at 69:20-22.

166.    Dr. Merkler discredited Dr. Grossinger's assertion that the C5-C6 radiculopathy was consistent with an injury that occurred on August 13, 2015 in the motor vehicle accident.  *See id.* at 70:7-11.  Dr. Merkler stressed that Dr. Grossinger erroneously based his conclusion on an "isolated moment in time" when Grossinger NeuroPain Specialists performed an EMG on September 24, 2015.  *Id.* at 70:12-20; Ex. P116 at 1-3.

167.    Dr. Merkler explained that an EMG or nerve conduction study does not indicate radiculopathy's etiology or cause in any way.   In the context of the clinical findings and radiography showing no trauma at the time of the August 13, 2015 accident, Dr. Merkler concluded that there was "no evidence of new injury at the time of the accident."  Doc. No. 93 at 56:17-57:4.

168.    Dr. Merkler explained that, although the EMG revealed evidence of a radiculopathy, the EMG did not and could not state why Ms. Diawara had a radiculopathy and whether that radiculopathy was acute or chronic.  *See* Doc. No. 93 at 70:12-20; Ex. P116 at 1-3.

169.    Dr. Merkler emphasized that the September 24, 2015 EMG, was particularly unreliable: "It's really a suboptimal study and it's missing reliable information which is something called a motor unit action potential . . . all you can really tell is that there's evidence of a radiculopathy.  It could be acute, but it could also be chronic, and it's by no means, no way, shape or form tells you why the person had a radiculopathy.  It could be from trauma, it could be from degenerative disc disease, it could be from a whole host of things.  It's impossible to tell."  Doc. No. 93 at 56:7-16.

170.     Dr. Merkler concluded that whether or not Ms. Diawara was in the August 13, 2015 accident, the EMG findings would have been "exactly the same." *Id.* at 70:20-24.

171.     On cross-examination, Dr. Merkler also discredited Plaintiffs' theory that Ms. Diawara's history supported the EMG findings of "acute" C5-C6 radiculopathy. Specifically, Dr. Merkler testified that an EMG is "purely based on the electrical diagnostic studies.  It's not based on the history."  Doc. No. 95 at 12:2-20.

172.     As for whether the pain went down her arm and the connection to C5-C6 radiculopathy, Dr. Merkler explained that because Ms. Diawara described the pain going down her arm into her "pinky finger, her ring finger, and her middle finger" the path is C7-C8.  He further opined that had the pain been on the other side of the arm going down to Ms. Diawara's thumb and index finger, then it would be a C5-C6, but "that's not actually what she complained about." *Id.* at 13:8-19.

173.     Dr. Merkler's evaluation and explanation discredited both Dr. Le Roux's and Dr. Bonner's reliance on the September 14, 2015 EMG to conclude that the August 13, 2015 motor vehicle accident caused Ms. Diawara's C5-C6 radiculopathy.  *See id.*; Bonner Tr. at 37:2-20.

174.     When pressed by Plaintiffs' counsel as to Dr. Le Roux's conclusions, Dr. Merkler stated that he agreed with Dr. Le Roux's diagnosis of C5-C6 and C6-C7 degenerative disc disease and the need for the cervical discectomy.  *See* Doc. No. 95 at 14:5-13.  He did not, however, agree that the need for the surgery was related to the August 13, 2015 motor vehicle accident.  *See id.* at 14:13-20.

175.     Dr. Merkler opined that although Ms. Diawara was in pain and although she had radicular pain, all her symptoms are "related to her progressive degenerative spinal disease and in no way related to the August 13, 2015 accident." *Id.* at 16:3-12.  He based this opinion on his

review of Ms. Diawara's historical medical records, including her prior MRIs, and took a "global approach" to preparing the most accurate and objective evaluation. He further noted that some of Plaintiffs' treating physicians and experts failed to review her prior complaints, prior MRIs, or information regarding the 2000 motor vehicle accident. *Id.* at 16:17-17:9.

176.     Dr. Merkler expanded on his testimony during re-direct examination by describing early medical records showing that Ms. Diawara had right-arm radiculopathy predating the August 13, 2015 motor vehicle accident. *See* Doc. No. 95 at 18:5-22:15.

177.     In a May 2006 medical record from Dr. Tiongson, Ms. Diawara's primary care physician, he described Ms. Diawara's visit to Taylor Hospital with complaints of "pain that travels up her back into her neck and down her (R) arm." Ex. P66 at 274.

178.     In his May 2006[1] note, Dr. Tiongson also stated that Ms. Diawara had been in a car accident five years prior that "caused her to have 3 degenerative discs in back" and "one bulging disc in neck." *Id.*

179.     Dr. Merkler opined that Dr. Tiongson's May 2006 medical record is relevant because it is "consistent with the fact that [Ms. Diawara] had radicular pain as early as, you know, 2006 as document here that goes from her back, her neck, and down her arm." Doc. No. 95 at 21:6-13.

180.     Dr. Merkler also described a Rothman Institute record dated January 24, 2013, which concluded Ms. Diawara had a history of cervical radiculopathy in her right shoulder. *Id.* at 21:18-22:4; Ex. P65 at 8 ("hx cervical radic. R shoulder").

---

[1]     Page 274 of Plaintiff's Exhibit 66 is dated May 26, 2005. However, Plaintiff's Exhibit 66 is ordered chronologically, and page 274 falls between records dated May 26, 2006 and June 6, 2006. As a result, the Court concludes that page 274 was created on May 26, 2006. And even if the document was created in 2005, that fact would not alter the Court's analysis, because what is material is the fact that it demonstrates radicular pain radiating down her arm before the August 13, 2015 motor vehicle accident.

181.     Thus, Dr. Merkler concluded that there was evidence of Ms. Diawara's C5-C6 radiculopathy dating back as far as 2006."  Doc. No. 95 at 21:6-13.

182.     Dr. Merkler opined that, in addition to the 2006 record showing a right cervical radiculopathy, this Rothman record showed evidence that "there was preexisting cervical radiculopathy prior to the August 13, 2015 motor vehicle accident" and, specifically, radiculopathy in her right shoulder.  *See* Doc. No. 95 at 22:8-15.

183.     On re-cross examination, Plaintiffs' counsel attempted to associate the January 2013 Rothman record and description of radiculopathy to Ms. Diawara's occipital headaches and shoulder pain following Ms. Diawara's son rolling on her right shoulder.  *See id.* at 23:5-20.  In response, Dr. Merkler opined that the description of radicular symptoms down her arm is "not consistent with an occipital neuralgia which is where you have radicular symptoms to the head." *Id.* at 23:17-25.  Rather, the 2013 record described cervical radiculopathy in her right shoulder. *See id.* at 22:11-13.

## V.     Testimony Regarding Ms. Diawara's Shoulder Injuries

### A.  Background Facts Regarding Ms. Diawara's Shoulder Injuries

184.     Prior to the date of the accident at issue in the instant lawsuit, Ms. Diawara had a medical history of shoulder bursitis, which apparently first began in January of 2013 after her son slept on her right shoulder.  *See* Ex. P65 at 9.

185.     Ms. Diawara was treated for her shoulder bursitis at the Rothman Institute on January 24, 2013, on which date she was given steroidal injections into her shoulder.  *See* Ex. P64 at 10.

186.     Almost a month later, Ms. Diawara returned to Rothman and her treaters noted that "she feels dramatically better after the steroid injections [given] at her last appointment" and that

"the patient has full range of motion of her shoulder today and negative impingement signs." *See* Ex. P65 at 6.

187.    On August 31, 2015, Ms. Diawara saw her primary care physician, Dr. Jose G. Tiongson due to ongoing pain and restricted range of motion in her right shoulder. *See* Doc. No. 94 at 25:8-18. *See also* Ex. P66 at 185; Ex. P196 ("McGlynn Tr.") at 42:3-44:12.

188.    At that same August 31, 2015 visit, Dr. Tiongson ordered an MRI of her right shoulder due to persistent shoulder pain, which was performed on September 2, 2015. *See* Doc. No. 94 at 10:20-23, 25:11-26:4. *See also* Ex. P113 at 1-3; Ex. P66 at 185.

189.    After reviewing the MRI report, Dr. Tiongson referred Ms. Diawara to the Rothman Institute on September 3, 2015 to receive injections into her rotator cuff to treat her shoulder pain. *See* Doc. No. 94 at 26:12-15. *See also* Ex. P66 at 184.

190.    On September 10, 2015, Ms. Diawara went to Rothman Orthopaedics where she was seen by Dr. Paul Marchetto, who administered a steroidal injection to Ms. Diawara for her shoulder pain. *See* Ex. P65 at 1-2.

191.    Ms. Diawara was referred by Dr. Tiongson to Dr. James T. McGlynn, an orthopedic surgeon with Premier Orthopaedics who specializes in shoulders and rotator cuffs. *See* Doc. No. 94 at 27:1-14. *See also* McGlynn Tr. at 10:7-21.

192.    On January 15, 2016, Ms. Diawara was seen by Dr. McGlynn. *See* McGlynn Tr. at 13:21-23.

**B.  Dr. Roy Lefkoe's Testimony**

193.    At trial, USPS presented the testimony of Roy T. Lefkoe, MD, a board certified orthopedic surgeon and former professor of orthopedic surgery at the University of Pennsylvania. *See* Doc. No. 92 at 7:12-8:25.

194.    Dr. Lefkoe has performed hundreds of right shoulder surgeries, including open surgeries, rotator cuff repairs, arthroscopic surgeries, and arthroscopic rotator cuff surgeries.  *Id.* at 9:9-17.  Dr. Lefkoe has also treated thousands of patients involved in motor vehicle accidents. *Id.* at 9:18-20.

195.    During "a Mini Musculoskeletal MRI Fellowship" in the University of Pennsylvania's Radiology Department, Dr. Lefkoe trained with radiologists to read MRIs.  He also regularly read MRIs as part of his practice as an orthopedic surgeon.  *Id.* at 10:3-13.

196.    Dr. Lefkoe confirmed that a correlation exists between property damage and the severity of a passenger's injuries.  *Id.* at 11:14-17.

197.    Dr. Lefkoe examined Ms. Diawara on June 4, 2019 in anticipation of drafting a report on her alleged injuries.  *Id.* at 13:5-17.

198.    During Dr. Lefkoe's examination on June 4, 2019, Ms. Diawara denied having any shoulder pain.  *Id.* at 17:12-16.

199.    During his examination, Dr. Lefkoe performed various clinical tests on Ms. Diawara, including the Waddell's tests.  *Id.* at 59:20-60:4.  The Waddell tests refer to a series of clinical tests that evaluate whether a person may be exaggerating pain.  *Id.* at 61:8-17.  Because Ms. Diawara acknowledged she was not experiencing shoulder pain at the time of the examination, the Waddell's test is effectively useless to ascertain whether Ms. Diawara may be malingering in expressing shoulder pain.  *See id.* at 17:12-16.

200.    A January 24, 2013 Rothman Institute consultation record noted that Ms. Diawara had "somewhat limited range of motion in her shoulder with forward flexion of about 155 degrees, abduction of 140 and internal rotation to her buttock.  Impingement signs are positive.  Rotator cuff strength is 5/5, but does cause some pain."   Ex. P65 at 10.

31

201.    According to a January 24, 2013 radiologist report, imaging of Ms. Diawara's right shoulder showed mild degenerative changes at the acromioclavicular joint and "some very mild curve to the acromion."  *Id.*

202.    A February 21, 2013 Rothman Institute treatment note stated that Ms. Diawara's rotator cuff "does reproduce some of her pain" and diagnosed her with "[r]ight shoulder bursitis and rotator cuff tendinosis."  *Id.* at 6.

203.    Dr. Lefkoe defined impingement as when "the supraspinatus of the rotator cuff impinges on th[e] acromioclavicular joint and the inferior acromion."  Doc. No. 92 at 24:7-11.

204.    Dr. Lefkoe further explained that spurs in the acromioclavicular joint gradually lead to bursitis and a wearing down of the rotator cuff.  *See* Doc. No. 92 at 24:13-17.

205.    Dr. Lefkoe explained that providers at Rothman Institute injected cortisone into subacromial bursa to relieve the inflammation and mitigate the impingement.  *See* Doc. No. 92 at 24:15-17.

206.    Dr. Lefkoe concluded that, at least starting in 2013, Ms. Diawara had "osteoarthritis, bursitis of the right shoulder, preexisting impingement, [and] degenerative changes at the AC joint of the shoulder."  Doc. No. 92 at 26:23-27:1.  He further concluded the bursitis and impingement caused Ms. Diawara's partially torn rotator cuff.  *Id.* at 27:4-6.

207.    Bursitis is an inflammation of tissue in and around the joint.  *Id.* at 27:17-19.

208.    Bursitis degenerates and may tear a rotator cuff because, as Dr. Lefkoe explained, the bursa "is a tissue which contains inflammatory enzymes which can continue to inflame and gradually irritate."  *Id.* at 28:12-19.

209.     Tendonitis is an acute inflammation in the tendons where tendinosis is chronic damage to tendons.  *Id.* at 28:20-25.  Tendinopathy means that the tendon is diseased and degenerated.  *Id.* at 37:9-15.

210.     Tendinosis can degenerate a rotator cuff.  *Id.* at 29:1-6.

211.     The July 16, 2014 Comprehensive Pain Management Center medical record noted that Ms. Diawara's right shoulder had a visual analog score of 9 out of 10, which Dr. Lefkoe described as extremely painful.  *See* Ex. D10 at 55; Doc. No. 92 at 29:19-30:2.

212.     The March 21, 2014 Comprehensive Pain Management Center medical note showed that Ms. Diawara continued to complain of right shoulder pain; her providers treated her tendonitis by prescribing Percocet and an additional injection.  *See* Ex. D10 at 58; Doc. No. 92 at 30:21-31:4.

213.     The August 6, 2015 Comprehensive Pain Management Center medical note showed that Ms. Diawara continued to complain of right shoulder pain; her treatment included oxycodone. *See* Ex. D10 at 7; Doc. No. 92 at 31:11-23.

214.     Providers at Columbia Women's and Children's Hospital diagnosed Ms. Diawara with a sprained shoulder and prescribed her oxycodone; the medical record does not indicate that providers prescribed that she use a sling.  *See* Ex. P60 at 3.

215.     Dr. Lefkoe testified that if Ms. Diawara suffered an acute complete rotator cuff tear because of the motor vehicle accident, she would have "a very severe painful response" and an "inability to move the shoulder without severe pain."  *See* Doc. No. 92 at 33:1-6.

216.     Dr. Lefkoe concluded there was no evidence that Ms. Diawara sustained a torn rotator cuff in the August 2015 motor vehicle accident.  *See* Doc. No. 92 at 33:8-11.

217.    Dr. Lefkoe reviewed and relied on the September 2, 2015 MRI and accompanying radiologist report of Ms. Diawara's right shoulder.  *See* Ex. P113 at 1.

218.    Dr. Lefkoe agreed with the reading radiologist's impressions of the right shoulder MRI dated September 2, 2015; they concluded the MRI showed rotator cuff tendinopathy, partial infraspinatus myotendinous tear, subacromial-subdeltoid bursitis, and mild acromioclavicular osteoarthritis.  *See* Ex. P113 at 1; Doc. No. 92 at 36:23-37:8.  Specifically, the acromioclavicular joint had "[m]ild degenerative change with findings of mild osteophytic spurring."  *See* Ex. P113 at 2.

219.    Muscle atrophy means that the muscle gets smaller, usually from lack of use.  *See* Doc. No. 92 at 38:15-19.

220.    Muscle atrophy and fatty infiltration ordinarily occur only after a full rotator cuff tear, not a partial tear.  *See* Doc. No. 92 at 38:20-39:6.

221.    According to Dr. Lefkoe, muscle atrophy and fatty infiltration would "take some time to occur . . . [a]t least a year or more" after a full thickness rotator cuff tear.  *See* Doc. No. 92 at 39:7-14.

222.    Dr. Lefkoe opined that, although "on the young side," it is "not unusual" for a forty-one-year-old person to experience a degenerative rotator cuff tear.  *See* Doc. No. 92 at 39:15-23.

223.    Dr. Lefkoe explained that the arthritis in the acromioclavicular joint, as noted in the September 2, 2015 MRI Report, forms a spur "inferiorly on the undersurface and that is exactly where the rotator cuff" is located.  *See* Doc. No. 92 at 40:1-9, 42:18-23.

224.    Dr. Lefkoe further explained that this spur is "constantly impinging, if you will, pressing on the rotator cuff and this adds to the perpetuation of the bursitis and degeneration and

is the basis, also, of part of the operation that Dr. McGlynn performed." *See* Doc. No. 92 at 40:9-13.

225.     On March 1, 2016, Dr. McGlynn performed arthroscopy of the right shoulder with subacromial decompression, rotator cuff repair, and biceps tenotomy. *See* Ex. P69 at 52.

226.     Dr. Lefkoe explained that arthroscopic surgery is "usually on a joint where we insert an arthroscope into the joint.  This is a round instrument about the size of a pencil." *See* Doc. No. 92 at 41:9-17.

227.     Dr. Lefkoe noted that one limitation of arthroscopic surgery is that the camera has a limited range of view and thus the surgeon cannot view many areas of a joint. *See* Doc. No. 92 at 41:18-22.

228.     During the surgery, Dr. McGlynn released the coracoacromial ligament and discovered "a moderate-size subacromial spur." Ex. P69 at 53.

229.     Dr. Lefkoe explained that a subacromial spur is an "arthritic spur [or] a protuberance of a piece of bone that has grown directly into the area where the rotator cuff tendon is." Doc. No. 92 at 42:13-15.

230.     Dr. Lefkoe explained that Ms. Diawara underwent a common route of postoperative treatment including physical therapy and home exercise until she reached her normal activities. *See* Doc. No. 92 at 43:3-12.

231.     Physical therapy records show that on June 16, 2016, Ms. Diawara stated that she did not have any pain and that she felt "pretty good today." Ex. D32 at 61.

232.     To a reasonable degree of medical certainty, Dr. Lefkoe diagnosed Ms. Diawara with "right shoulder sprain and strain by history objectively resolved.  Degenerative tear rotator cuff right shoulder with chronic bursitis and degenerative joint disease preexisting.  Status

postsurgical arthroscopy right shoulder with subacromial decompression rotator cuff repair and biceps tenotomy." Doc. No. 92 at 44:9-19.

233.    Dr. Lefkoe concluded that Ms. Diawara fully recovered from her rotator cuff surgery by June 16, 2016. *See* Doc. No. 92 at 43:13-44:5.

234.    Dr. Lefkoe concluded to a reasonable degree of medical certainty that the August 13, 2015 motor vehicle accident did not cause Ms. Diawara's rotator cuff to tear. *See* Doc. No. 92 at 44:24-45:2.

235.    Dr. Lefkoe concluded to a reasonable degree of medical certainty that the August 13, 2015 motor vehicle accident did not cause any of Ms. Diawara's shoulder injury besides her self-reported strain and sprain. *See* Doc. No. 92 at 45:3-6.

236.    Dr. Lefkoe concluded to a reasonable degree of medical certainty that Ms. Diawara does not have any lingering injuries to her right shoulder. *See* Doc. No. 92 at 45:7-9.

237.    Dr. Lefkoe concluded to a reasonable degree of medical certainty that Ms. Diawara does not require any additional treatment related to her right shoulder. *See* Doc. No. 92 at 45:10-13.

### C.  Dr. James T. McGlynn

238.    Dr. James McGlynn agreed that his treatment was limited to Ms. Diawara's right shoulder.  McGlynn Tr. at 16:10-17:3.

239.    Dr. McGlynn testified that he concluded, to a reasonable degree of medical certainty, that Ms. Diawara's rotator cuff tear was directly caused by the August 13, 2015 accident. McGlynn Tr. at 37:20-39:1.

240.    Dr. McGlynn acknowledged that Ms. Diawara had right shoulder tendonitis before the motor vehicle accident.  McGlynn Tr. at 23:12-18.

241.    Dr. McGlynn acknowledged that Ms. Diawara had right shoulder bursitis before the motor vehicle accident.  McGlynn Tr. at 81:18-23.

242.    Dr. McGlynn cannot determine whether a traumatic event versus atraumatic degeneration caused a rotator cuff tear.  McGlynn Tr. at 79:14-20.

243.    Rather, Dr. McGlynn expressed that the August 13, 2015 motor vehicle accident caused Ms. Diawara's rotator cuff tear because the surrounding muscles did not show signs of an older tear (i.e., atrophy and fatty infiltration).  McGlynn Tr. at 77:13-24.

244.    However, he admitted that muscle atrophy and fatty infiltration ordinarily occurs only in a full tear, not a partial tear.  McGlynn Tr. at 114:20-115:6.

245.    Dr. McGlynn's opinion that Ms. Diawara's right shoulder MRI dated September 2, 2015 shows a full rotator cuff tear, (McGlynn Tr. at 30:22-31:2), conflicts with the reading radiologist's impression of a partial tear, (Ex. P113 at 1).

246.    Moreover, Dr. McGlynn suggested that muscle atrophy and fatty infiltration would start to appear around a year after the rotator cuff fully tore.  McGlynn Tr. at 55:6-8.

247.    Dr. McGlynn conceded that, during Ms. Diawara's arthroscopic surgery, he was unable to view whether muscle atrophy or fatty infiltration occurred.  McGlynn Tr. at 55:17-56:1.

248.    Therefore, even assuming that the rotator cuff was fully torn, Dr. McGlynn's could only ascertain that the full tear occurred at best within a year of the MRI dated September 2, 2015. McGlynn Tr. at 77:12-24.

249.    Dr. McGlynn acknowledged that he performed Ms. Diawara's rotator cuff repair surgery without any complications and she went home on the same day.  McGlynn Tr. at 57:15-18, 59:1-3.

250.     Dr. McGlynn opined that Ms. Diawara would not have any future limitations regarding her right rotator cuff.  McGlynn Tr. at 67:23-68:4.

251.     According to Dr. McGlynn, Ms. Diawara was able to eat, type, text, and drive with her right arm during the six weeks post-surgery.  McGlynn Tr. at 59:2-60:13.

252.     Dr. McGlynn conceded that, as a person ages, a rotator cuff can degenerate and lead to a tear.  McGlynn Tr. at 79:6-13.

253.     Dr. McGlynn acknowledged that opioid and tobacco use (both of which in relatively minor respects are part of Ms. Diawara's socio-medical history) hinders a patient's recovery from a rotator cuff repair surgery.  McGlynn Tr. at 84:23-85:13.

254.     The Court did not find Dr. McGlynn's opinion testimony persuasive. Dr. McGlynn's testimony that the August 13, 2015 accident caused Ms. Diawara's rotator cuff to tear is called into question by his further testimony that he could not determine whether a traumatic event or degeneration caused a rotator cuff tear, McGlynn Tr. at 79:14-20, and that he could not see for certain whether atrophy or fatty infiltration had occurred because an arthroscopic procedure gave limited visibility of the affected area, McGlynn Tr. at 55:17-56:1.  Dr. McGlynn's testimony is also contradicted by Dr. Lefkoe's testimony that if Ms. Diawara had suffered an acute complete rotator cuff tear because of the motor vehicle accident, she would have had severe pain and would have been unable to move her shoulder without severe pain.  *See* Doc. No. 92 at 33:1-6.  Rather, the record shows that Ms. Diawara had limited pain after the accident, and was able to move her shoulder without the use of a sling.

VI.     **Testimony Regarding Damages**

      **A.  Damages Regarding Past Medical Expenses**

255.     Plaintiffs claim their out-of-pocket expenses related to medical care rendered to J.D. on August 13, 2015 is $672.75.[2]

256.     Plaintiffs claim their out-of-pocket expenses related to the medical care rendered to R.D. on August 13, 2015 is $933.92.

      **B.  Andrew C. Verzilli's Testimony Regarding Future Economic Damages**

257.     Plaintiffs retained Andrew C. Verzilli, an economist, to calculate Ms. Diawara's economic losses.  *See* Doc. No. 94 at 86:15-20, 90:1-4.

258.     Mr. Verzilli reviewed the following records in preparing his opinion: the Complaint; Ms. Diawara's W-2 forms for the years 2013 through 2017; Ms. Diawara's application for Social Security Disability benefits; Dr. Hauser's report; and Dr. Grossinger's report.  *See* Doc. No. 94 at 111:3-112:5.

259.     Mr. Verzilli testified that the Social Security Disability Determination supports his assumption that Ms. Diawara sustained injuries in the August 2015 motor vehicle accident which prevent her from working for the remainder of her life.  *See* Doc. No. 94 at 97:24-98:3.

260.     Mr. Verzilli used the Center for Disease publication to calculate Ms. Diawara's life expectancy but this publication does not account for a person's co-morbidities.  *See* Doc. No. 94 at 98:13-22, 95:17-96:10.

261.     Mr. Verzilli relied on Ms. Diawara's social security application to assume that Ms. Diawara cannot perform the household services she listed in the application.  *See* Doc. No. 94 at 104:6-17.

---

[2]     Plaintiff Jennifer Diawara's insurance carrier asserts a lien for $30.80 and $116.90 for the medical care rendered on August 13, 2015.  *See* Ex. P161 at 4.

262.    In forming his opinion, Mr. Verzilli did not speak with Ms. Diawara, speak with Alpha Diawara, review Ms. Diawara's employment records, or review any deposition transcript. *See* Doc. No. 94 at 114:3-20.

263.    Mr. Verzilli conceded that he does not have any training, experience, or education to determine whether Ms. Diawara possesses a medical condition or to what extent a medical condition will limit her ability to perform a given task. *See* Doc. No. 94 at 114:25-115:10.

264.    Mr. Verzilli was asked whether the injuries Ms. Diawara alleged in her application for social security disability benefits were the same injuries alleged in this case, and he responded "I don't know if I—I assume they are. I mean that's why we're all here, but I'm not—I can't give an opinion of causation . . . ." Doc. No. 94 at 115:11-18.

265.    Mr. Verzilli noted that Ms. Diawara earned more income in 2017 than the year prior to the motor vehicle accident (2015). *See* Doc. No. 94 at 120:12-20.

266.    Mr. Verzilli assumed that Ms. Diawara has not engaged in any gainful employment since 2017. *See* Doc. No. 94 at 122:15-20.

267.    Ms. Diawara currently owns a real estate company, Diawara Investment Group, LLC. *See* Doc. No. 94 at 65:24-67:23. The website for Diawara Investment Group, LLC currently advertises that Ms. Diawara is a manager and that the company address is Ms. Diawara's home address. *See* Doc. No. 94 at 67:5-15.

268.    Ms. Diawara filed a lawsuit against the opposing driver in the 2000 motor vehicle accident and alleged that she suffered debilitating back injuries. *See* Doc. No. 94 at 73:14-74:9.

269.    In January 2015, eight months before the motor vehicle accident at issue here, Ms. Diawara filed a lawsuit against Mainline Health Systems, alleging that, due to the hospital's

negligence, she suffered and continued to suffer injuries that caused anguish, distress, embarrassment, and loss of enjoyment of life. *See* Doc. No. 94 at 77:18-78:3.

### C. Chad L. Staller's Testimony Regarding Andrew C. Verzilli's Report

270.    USPS presented at trial the testimony of Chad L. Staller, a Senior Economist and President at the Center for Forensic Economic Studies. *See* Doc. No. 95 at 34:21-23.

271.    Mr. Staller earned a Bachelor's of Science in Economics at Lehigh University, a juris Doctorate from Beasley School of Law, a Master's in Business Administration at Temple University, and a Master's of Accountancy from Villanova University. *See* Doc. No. 95 at 34:8-19.

272.    One of Mr. Staller's primary responsibilities as a Senior Economist at Center for Forensic Economic Studies is to develop economic models for purposes of litigation. *See* Doc. No. 95 at 35:1-4.

273.    He has authored four to six articles concerning models of economic damages arising in personal injury cases. *See* Doc. No. 95 at 35:20-24.

274.    Mr. Staller evaluated Ms. Diawara's claim of economic loss, if any, arising from the August 2015 motor vehicle accident and commented on Mr. Verzilli's assumptions underlying his economic report. *See* Doc. No. 95 at 37:17-25.

275.    In forming his economic analysis in this matter, Mr. Staller reviewed and relied on the complaint, answers to interrogatories, Ms. Diawara's W-2 forms for the years 2013 through 2017, Mr. Verzilli's economic report, and Dr. Lefkoe's medical report dated June 4, 2019. *See* Doc. No. 95 at 39:2-7.

276.    Mr. Staller reviewed Dr. Merkler's medical report (which was issued after Mr. Staller's economic report) and concluded that it supported his economic conclusions. *See* Doc. No. 95 at 39:24-40:4.

277.     Ms. Diawara's earnings were $48,714 in 2013, $55,014 in 2014, $78,838 in 2015, $63,423 in 2016, and $80,395 in 2017.  *See* Ex. P174; Doc. No. 95 at 40:12-18.

278.     Mr. Staller calculated Ms. Diawara's lost earnings as $0 to a reasonable degree of economic certainty.  *See* Doc. No. 95 at 41:3-5, 50:16-17.

279.     Mr. Staller based his estimate of no lost earnings on Dr. Lefkoe's opinion that the motor vehicle accident did not alter Ms. Diawara's medical conditions.  *See* Doc. No. 95 at 41:19-42:2.  According to Mr. Staller, Dr. Merkler's virtually identical conclusion corroborated Dr. Lefkoe's opinion.  *See* Doc. No. 95 at 56:5-13.

280.     Mr. Staller disagreed with Mr. Verzilli's assumptions about Ms. Diawara's work life expectancy, fringe benefits, model of lost household services, and the growth factor of future medical care.  *See* Doc. No. 95 at 42:20-42:1, 50:16-19.

281.     Mr. Staller explained that the term "work life expectancy" refers only to the period that a person is expected to retain full-time employment; whereas, retirement age necessarily extends beyond the work life expectancy and refers to the most distant point in time that a person may continue any employment (e.g., part-time employment).  *See* Doc. No. 95 at 43:4-45:10.

282.     Mr. Verzilli relied on the Social Security Administration's estimation for a normal retirement age of 67 and consequently overestimated Ms. Diawara's lost earnings.  *See* Doc. No. 95 at 44:11-14.

283.     Mr. Staller explained that the Journal of Forensic Economics table on work life expectancy is the proper measure of lost earnings, and projects that someone of Ms. Diawara's demographics will work full-time until age 63.1.  *See* Doc. No. 95 at 44:16-45:7.

284.    Mr. Verzilli also assumed that Ms. Diawara would receive the benefits from employer-based health insurance and retirement benefits, which Mr. Verzilli respectively calculated at 14.6% and 3% of Ms. Diawara's expected earnings.  *See* Doc. No. 95 at 45:12-16.

285.    Mr. Staller disagreed with Mr. Verzilli's assumption that Ms. Diawara's health insurance would necessarily cost 14.6% of her expected income.  *See* Doc. No. 95 at 45:21-23.

286.    Mr. Staller explained that relying on a percentage of income is imprecise because typically, health care costs remain stagnant across people with different levels of income.  *See* Doc. No. 95 at 45:23-46:15.

287.    Mr. Staller further explained that health employer-sponsored benefits, as reported in Box DD of a W-2 Form, more accurately reflect an individual's cost of healthcare.  *See* Doc. No. 95 at 46:16-18.

288.    Mr. Verzilli projected that Ms. Diawara's economic losses includes a category of damages for healthcare benefits and future medical expenses.  *See* Doc. No. 95 at 46:21-47:12.

289.    Mr. Staller explained that healthcare insurance covers some or all of the costs of future medical expenses, and therefore Mr. Verzilli's estimates in these categories essentially represent double counting.  *See* Doc. No. 95 at 46:21-47:12, 60:22-61:5.

290.    Mr. Verzilli also overestimated Ms. Diawara's purported lost household services. *See* Doc. No. 95 at 47:13-16.

291.    Mr. Verzilli, without explanation, assumed that the rate to replace Ms. Diawara's purported lost services was $15 per hour.  *See* Doc. No. 95 at 48:9-12.

292.    Mr. Staller estimated that the average replacement rate in Philadelphia, Pennsylvania for services generally associated with household production (e.g., chefs, house cleaners, taxicab drivers) is $13 per hour.  *See* Doc. No. 95 at 48:12-19.

293.     Mr. Staller maintained that Plaintiffs' receipts from related expenses (such as from house cleaners and taxi services) constitute a more accurate measure of lost household services for the time between the August 13, 2015 motor vehicle accident and trial.  *See* Doc. No. 95 at 48:20-49:4.

294.     Mr. Verzilli used the consumer price index ("CPI")'s projection of 2.9 percent (2.9 %) inflation to calculate the cost of Ms. Diawara's purported future medical care.  *See* Doc. No. 95 at 49:25-50:2.

295.     Mr. Staller explained that the generally accepted methodology among economists is to measure growth of future medical care costs through historical measures of inflationary factors for various items of medical care.  *See* Doc. No. 95 at 49:11-14.

296.     CPI is the broadest measurement of inflation in the United States' economy, and the medical care component of CPI contains approximately nine to ten subcategories of medical costs.  *See* Doc. No. 95 at 49:15-22.

297.     Mr. Staller explained that the 2.9 percent (2.9%) inflation rate, which Mr. Verzilli utilized, does not accurate account for the variance between injection, therapies, and medications. *See* Doc. No. 95 at 50:5-11.

298.     The Court did not find Mr. Verzilli's opinion testimony persuasive.  His expert report frequently neglected facts or matters that were contrary to Ms. Diawara's position. Mr. Verzilli did not explain why he relied on the Social Security Administration's estimation for a normal retirement age of 67, rather than evidence of how long a person with Ms. Diawara's demographics will work full-time.  Mr. Verzilli did not support his assumption that Ms. Diawara's health insurance would cost 14.6% of her expected income, regardless of the amount of income

she actually earned.  Mr. Verzilli also did not support his assumption that the rate to replace any of Ms. Diawara's lost services would be $15 per hour.

CONCLUSIONS OF LAW

I.    **FCTA and Missouri Law**

1.    This case arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. ("FTCA").

2.    The FTCA grants federal district courts exclusive jurisdiction over certain tort claims against the United States. 28 U.S.C. § 1346(b). This Court has jurisdiction in this matter. *Id.*

3.    The United States may be held liable under the FTCA only to the extent that a private party would be held liable under like circumstances based on the law of place where the alleged act or omission occurred.  *See* 28 U.S.C. §§ 1346(b)(1), 2674.  *See also F.D.I.C. v. Meyer*, 510 U.S. 471, 477-78 (1994).

4.    Because the motor vehicle accident occurred in Missouri, its substantive law governs this matter.  *See* 28 U.S.C. § 2674.

5.    To establish a negligence claim under Missouri law, a plaintiff must prove that: (1) "the defendant had a legal duty to conform to a certain standard of conduct to protect others against unreasonable risks"; (2) breach of that duty; (3) proximate causation between the breach and the resulting injury; and (4) actual damages.  *Kuhn v. Budget Rent-A-Car of Mo., Inc.*, 876 S.W.2d 668, 672 (Mo. Ct. App. 1994).

II.    **Duty and Breach are Uncontested**

6.    Under Missouri law, a driver possesses a duty to operate a motor vehicle in a prudent manner.  Mo. Rev. Stat. § 304.012.1.

7.      Amanda Galbreath was a United States employee acting within the scope of her employment at the time of the motor vehicle accident on August 13, 2015.  *See* Doc. No. 53 at 1.

8.      USPS does not contest that Ms. Galbreath possessed and breached a duty of care to drive her vehicle prudently at the time of the motor vehicle accident.  *See* Doc. No. 53 at 1.

## III.    Ms. Diawara Did Not Carry Her Burden of Proving That the Accident Aggravated Her Preexisting Conditions

9.      The element of causation requires a plaintiff to prove both cause in fact and proximate cause.  *Heffernan v. Reinhold*, 73 S.W.3d 659, 664 (Mo. Ct. App. 2002).

10.     Cause in fact means that the plaintiff's injury would not have occurred but for the defendant's conduct.  *Id.*  Proximate cause means that the harm was the reasonable and probable consequence of the defendant's conduct.  *St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 114 (Mo. 2007).

11.     Proximate cause excludes from liability even negligent conduct that is "too far removed from the ultimate injury or damage."  *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. 2001) (en banc).

12.     In cases involving aggravated injuries, a plaintiff still bears the initial burden to produce "substantial evidence" that the purportedly negligent conduct aggravated her preexisting injuries.  *See Kingman v. Dillard's, Inc.*, 643 F.3d 607, 613 (8th Cir. 2011).  *See also Miller v. Gulf, M. & O. R. Co.*, 386 S.W.2d 97, 102 (Mo. 1964) ("The line between an aggravation and the normal progress of a chronic pathological condition may be a hazy one, but under our practice a jury is entitled to make the finding if there is substantial evidence of aggravation.").

13.     If a plaintiff satisfies that initial burden, the defendant may then "challenge the extent to which her injuries were directly attributable to its own negligence." *Kingman*, 643 F.3d at 614.

14.     A defendant is responsible for those damages that the defendant "directly caused or contributed to cause" to the plaintiff, not the harm that occurs due to the preexisting condition. *Lockhart v. United States*, 834 F.3d 952, 956 (8th Cir. 2016) (quoting *Carlson v. K–Mart Corp.*, 979 S.W.2d 145 (Mo. banc 1998)). In other words, a tortfeasor is liable for "the aggravation—a causal apportionment."  Dan B. Dobbs et al., *The Law of Torts* § 192 (2d ed.).

15.     A defendant's conduct does not directly cause or contribute to cause the plaintiff's injury when the normal progress of a chronic pathological condition causes the plaintiff's injury. *Miller*, 386 S.W.2d at 103.

16.     The Court finds that Ms. Diawara failed to produce substantial evidence that the motor vehicle accident on August 13, 2015 caused or exacerbated her back, neck, or shoulder injuries.

17.     In addition to the evidence discussed above, the Court's finding is based in part on the fact that it did not find Ms. Diawara's own testimony credible.  While Ms. Diawara contends that she is permanently disabled because she cannot sit for long periods of time, this contention was inconsistent with, among other things, the Court's observation that each day during the trial, Ms. Diawara sat on hard wooden courtroom benches or on a chair for hours at a time without respite, in which she showed a normal range of movement without hesitation or observable difficulty, including the ability to reach down to the floor to pick up items that had been dropped, stand up without hesitation, and resume her seated position without grimace or hesitation.

18.     The Court's conclusion that the August 13, 2015 accident was not the cause of Ms. Diawara's injuries is also in part a common-sense inference from the fact that neither the Diawara's nor the USPS's vehicles sustained any visible damage.  *See* Ex. P59 at 9; Ex. P11. Dr. Lefkoe's expert opinion confirmed this common-sense inference when he testified that there

is a correlation between property damage and the severity of a passenger's injuries.  *See* Doc. No. 92 at 11:14-17.

## IV.     Ms. Diawara Proved the Existence of Only Minor Damages

19.     The Court as factfinder may consider several factors in valuing the appropriate amount of compensatory damages.  *McCormack v. Capital Elec. Constr. Co., Inc.*, 159 S.W.3d 387, 395 (Mo. Ct. App. 2004).  These factors can include loss of income, medical expenses, the plaintiff's age, the nature and extent of the injury, and other intangibles such as pain and suffering. *Id.* (citing *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 249 (Mo. 2001)).

20.     To establish damages, Plaintiff "must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'"  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (quoting *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)).  *See also Dodson v. Ferrara*, 491 S.W.3d 542, 567 (Mo. 2016) ("Damages for loss of future earnings must be established with reasonable [albeit not absolute] certainty . . . .").

21.     With respect to an award for past medical expenses, Missouri law requires the introduction of "evidence of the value of the medical treatment rendered to a party that was reasonable, necessary, and a proximate result of the negligence of any party."   Mo. Stat. § 490.715.5(1) (2015).

22.     Under Mr. Verzilli's economic model, USPS would compensate Ms. Diawara for both the cost of her purported future medical care, (*see* Doc. No. 94 at 99:1-13), and the cost of obtaining healthcare insurance that would simultaneously cover that care, (*see* Doc. No. 94 at 94:20-25).  Missouri's Collateral Source Rule precludes a defendant from introducing evidence of a plaintiff's insurance benefits when the plaintiff paid for those benefits.  *Smith v. Shaw*, 159 S.W.3d 830, 832 (Mo. 2005).  But, "[w]here the plaintiff has incurred no expense, obligation, or liability in securing the insurance coverage in question, the collateral source rule has no

application." *Moore Auto. Grp., Inc. v. Lewis*, 362 S.W.3d 462, 471 (Mo. Ct. App. 2012) (quoting *Duckett v. Troester*, 996 S.W.2d 641, 648 (Mo. App. W.D. 1999)); *see also Tatum v. Van Liner Ins. Co.*, 104 F.3d 223, 225 (8th Cir. 1997) ("[T]he application of the collateral source rule depends on proof that the plaintiff has contributed to the fund he claims as a collateral source."). Missouri's Collateral Source Rule does not bar USPS from obtaining an offset for what would otherwise amount to Ms. Diawara's double-recovery. Thus, even if the Court found that the accident caused Ms. Diawara's injuries, it would refuse to permit Ms. Diawara double-recovery for future medical care.

23.     In a recent case, another court in this district excluded Andrew Verzilli's testimony, finding that Mr. Verzilli based his valuations of a plaintiff's purported economic losses on vague and unsupported data. *Karpf v. Mass. Mut. Life Ins. Co.*, No. 10-cv-1401, 2019 WL 468808, at *4 (E.D. Pa. Feb. 6, 2019). Here, again, Mr. Verzilli exclusively or largely relied on Ms. Diawara's application for social security disability benefits to support his calculation of Ms. Diawara's lost household services. *See* Doc. No. 94 at 104:6-17. Because, among other reasons, Ms. Diawara's application for social security disability benefits do not address the same injuries alleged in this case, this Court concludes that Mr. Verzilli's calculation of lost household services is unreliable here.

24.     Under Missouri law, a layperson lacks the expertise to calculate life expectancy of a person who possesses comorbidities. *Sampson v. Mo. Pac. R. Co.*, 560 S.W.2d 573, 586 (Mo. 1978). Under Missouri law, a mortality table absent accompanying qualified expert testimony ordinarily cannot establish a plaintiff's life expectancy. *Id.* at 587 (quoting *Dorsey v. Muilenburg*, 345 S.W.2d 134, 142 (Mo. 1961)). *See also Stone v. Mo. Dep't of Health & Senior Servs.*, 350 S.W.3d 14 (Mo. 2011) ("When a fact at issue is so technical or complex that no fact finder could

resolve without expert testimony, expert testimony is 'necessary' and, therefore required."). Because Plaintiffs failed to present expert testimony establishing Ms. Diawara's life expectancy, Ms. Diawara has not met her burden of proof with regard to future lost earnings, lost services, and future medical care.

25. Because the Court holds that Ms. Galbreath's negligence did not aggravate Ms. Diawara's preexisting injuries, Ms. Diawara is not entitled to damages for pain and suffering, humiliation, mental anguish, disfigurement, or loss of enjoyment of life.

26. Plaintiffs bear the burden to prove Ms. Diawara's purported lost earning capacity. *See Skadal v. Brown*, 351 S.W.2d 684, 688 (Mo. 1961). In a Daubert Order dated March 9, 2020, this Court underscored why vocational expertise is necessary to rule on Ms. Diawara's case: "how [Ms. Diawara's] neurological symptoms or limitations impact her employability" are the sort of opinions "that should be left to the judgment of a vocational expert." Doc. No. 46 at 14 (citing *Boyer v. City of Phila.*, No. 13-cv-6495, 2018 WL 4252378, at *3 (E.D. Pa. Sept. 6, 2018)). Indeed, assessing Ms. Diawara's future employability is particularly complex because, among other reasons, she worked full-time for approximately two years post-accident. *See* Ex. P174; Doc. No. 95 at 40:12-18. This Court concluded that Ms. Diawara's treating neurologist, Dr. Grossinger, lacked the requisite vocational expertise to testify on the subject. Doc. No. 46 at 14. The limitations in Dr. Grossinger's background are equally apparent in Dr. Hauser's background who also proffered vocational testimony. Without any expert testimony on vocational ability, this Court will not award any damages for Ms. Diawara's lost earnings.

27. The United States Court of Appeals for the Eighth Circuit recently clarified how Missouri law measures damages for a plaintiff with preexisting injuries. In *Lockhart v. United States*, a plaintiff, who suffered from preexisting degenerative conditions similar to those of

Ms. Diawara, was involved in a motor vehicle accident with a federal employee.  834 F.3d 952, 953-54 (8th Cir. 2016).  The district court held that the United States, although 100% at fault for the accident, was only 20% responsible for the plaintiff's shoulder injury.  *Id.* at 953-54 (applying Missouri law). Based on Missouri law, the district court accordingly reduced by 80% the awards for the plaintiff's medical expenses and for pain and suffering.  *Id.*  The Eighth Circuit Court of Appeals affirmed.  *Id.* at 958.  Here, Plaintiffs admitted that Ms. Diawara suffered from a multitude of preexisting degenerative back, neck, and shoulder injuries.  Thus, the Court, as in *Lockhart*, is obliged to reduce any prospective award.

28.     Plaintiffs' damages may not exceed the amount of the "sum certain" alleged in the administrative claim filed on July 27, 2017 ($850,000 for Ms. Diawara, and $75,000 each for J.D. and R.D.), 28 U.S.C. § 2675(b).  The Court erred in allowing Plaintiffs to amend the ad damnum clause of Standard Form 95 to $1,051,880 in lost earning capacity and a range of total economic losses of $1,549,968 to $1,654,668 (with medical costs and loss in services). 28 U.S.C. § 2675(b). As such, USPS maintains that the sum certain amounts listed in Plaintiffs original administrative claims should control and limit any prospective award to $1,000,000.

29.     Attorney's fees may not exceed twenty-five percent of any judgment in Plaintiffs' favor.  28 U.S.C. § 2678.  Plaintiffs also may not recover a separate award of attorney's fees, *id.*, or prejudgment interest, 28 U.S.C. § 2674.

30.     Ms. Diawara proved that she incurred $147.70 in medical expenses as a direct result of the motor vehicle accident for care rendered on August 13, 2015.  Pl. Ex. 161 at 4.  Ms. Diawara is entitled to recover this amount.

## V.     Plaintiff R.D. is Entitled to Stipulated Damages

31.     USPS does not contest proximate causation as the injuries of minor Plaintiff R.D., and has stipulated to economic damages in the amount of $933.93.  *See* Doc. No. 91 at 17:25-18:4.

32.     Plaintiff R.D. did not prove that he was entitled to damages for past pain and suffering, mental anguish, and loss of enjoyment of life.

**VI.     Plaintiff J.D. is Entitled to Stipulated Damages**

33.     USPS does not contest proximate causation of the injuries to Plaintiff J.D., and has stipulated to economic damages in the amount of $642.75.  *See* Doc. No. 90 at 9:10-13; Doc. No. 91 at 17:25-18:4.

34.     Plaintiff J.D. did not prove that he was entitled to damages for past pain and suffering, mental anguish, and loss of enjoyment of life.

#### CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Plaintiff Jennifer Diawara, Plaintiff R.D., and Plaintiff J.D in the amounts set forth above.  An appropriate order follows.

**BY THE COURT:**

*s/Gene E.K. Pratter*

_____

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**